Della Denise Pittman **SAVILLE,**
Plaintiff,

v.

**HOUSTON COUNTY HEALTHCARE AUTHORITY, et al., Defendants.**

Civ. A. No. 93–T–704–S.

United States District Court,
M.D. Alabama,
Southern Division.

May 12, 1994.

Samuel Fisher, Ann C. Robertson, Gordon, Silberman, Wiggins & Childs, Birmingham, AL, for plaintiff Della Denise Pittman Saville.

David J. Middlebrooks, Robert David Proctor, Albert Loring Vreeland, II, Lehr, Middlebrooks & Proctor, Birmingham, AL, for defendants Houston County Healthcare Authority, Southeast AL Medical Center and Virginia Gail Holliday, individually and in her official capacity as Director of Manley L. Cummins School of Nurse Anasthesia.

Dow T. Huskey, Jr., Dothan, AL, for defendant Troy State University.

Gary Clayborn Sherrer, Hall, Sherrer & Smith, Dothan, AL, Mary E. Pilcher, Webb & Eley, P.C., Montgomery, AL, for defendant Michael Shanks, individually and in his official capacity and as an agent/employer.

## ORDER

MYRON H. THOMPSON, Chief Judge.

Plaintiff Della Denise Pittman Saville charges defendants—Houston County Healthcare Authority, Southeast Alabama Medical Center, and supervising nurse anesthetist Michael Shanks—with sexual harassment and retaliatory termination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. §§ 2000e through 2000e–17, as amended by the Civil Rights Act of 1991, 42 U.S.C.A. § 1981a; in violation of Title IX of the Education Amendments of 1972, 20 U.S.C.A. §§ 1681 to 1688; and in violation of the first and fourteenth amendments to the United States Constitution, as enforced by 42 U.S.C.A. § 1983.[1] Saville further charges that Shanks conspired with others to deprive her of equal protection of the laws on the basis of her sex, in violation of 42 U.S.C.A. § 1985(3). Finally, she charges all defendants with state-law claims of invasion of privacy, outrageous conduct, and assault and battery. Relying on 28 U.S.C.A. §§ 1331, 1343, 1367, and 42 U.S.C.A. § 2000e–5(f)(3), she has properly invoked both the original and supplemental jurisdiction of the court.

This cause is currently before the court on several motions: (a) a motion for summary judgment filed by the institutional defendants, Houston County Healthcare Authority and Southeast Alabama Medical Center; (b) a motion for summary judgment filed by Shanks; (c) motions by the institutional defendants to strike certain of Saville's evidentiary submissions; and (d) a motion by Saville to amend her complaint to add a breach-of-contract claim. For the reasons that follow, the motions for summary judgment will be granted in part, the motions to strike will be denied as moot, and the motion to amend will be granted.

## I. BACKGROUND

Saville enrolled in the Manley L. Cummins School of Nurse Anesthesia in September 1990. The Cummins School is located within and is a part of the Southeast Alabama Regional Medical Center, which in turn is operated by the Houston County Healthcare Authority. Prior to enrolling, Saville was a registered nurse with at least eleven years in critical-care nursing and had been certified in advanced cardiac life support. With these qualifications, she surpassed the minimum admission requirements of the nurse anesthesia program. All of the students in Saville's class were women.

The nurse anesthesia program at the Medical Center consisted of a two-year curriculum, with the first three-month period dedicated to classroom instruction and the remainder dedicated to clinical education in the operating room. It appears undisputed that Saville performed well in the academic portion of the program. The parties dispute whether she received poor clinical evaluations prior to June 7, 1991.

In June 1991, Virginia Gail Holliday became the director of the Cummins School of Nurse Anesthesia. Saville alleges that Holliday completely changed the evaluation process; the institutional defendants assert that she implemented the first formal evaluation procedure in the nurse anesthesia program. Shanks was employed at the Cummins School as a certified registered nurse anesthetist and as an instructor. He supervised Saville and evaluated her performance. The gravamen of Saville's complaint is an alleged incident of sexual harassment that occurred on June 7, 1991.

Saville alleges that several incidents of inappropriate sexual comments directed toward her by Shanks—all of which are denied by Shanks—occurred prior to the incident of June 7, 1991. In one instance, Shanks allegedly discussed with Saville his sex life with his wife, complaining about infrequent sexual relations. He then allegedly stated that "he was going to bang whoever was bending over."[2] Saville was offended by this discus-

---

1. The Title IX claim is brought only against the institutional defendants, Houston County Healthcare Authority and Southeast Alabama Medical Center. See Plaintiff's Supplemental Response to Defendants' First Set of Interrogatories. Defendants Virginia Gail Holliday, director of the Man-

ley L. Cummins School of Nurse Anesthesia, and Troy State University were dismissed by orders of October 28 and December 16, 1993, respectively.

2. Saville Depo., at 72.

sion. Another time, Shanks allegedly told Saville during an operation that she was a student who was to fade into the woodwork and be seen and not heard, after which he told her: "I want a shot of leg."[3] Saville states that she reported this incident to Linda Callahan, then director of the nurse anesthetist program. When asked by Callahan whether she should speak to Shanks, Saville stated "No, I am afraid it will hurt me in school. I have handled it."[4] On another occasion, Shanks allegedly suggested in front of Saville's supervisors that Saville was a lesbian because she hugged another female student. In the presence of Dr. Shannon Carson, on yet another occasion, Shanks allegedly grabbed Saville in the rib cage from behind. Saville then stated, in the presence of Dr. Carson, that she grew up with boys and would defend herself if Shanks kept bothering her. Shanks responded that he didn't "see any boys around here" and walked off. Dr. Carson did not respond.

The key incident in this case occurred on June 7, 1991. Saville alleges that she was in the recovery room when another nurse stated "we are working our asses off." Another female nurse, Marty Jackson, then grabbed Saville's buttocks and said "obviously not yours." Saville was concerned about this incident because she had been told that Jackson was a lesbian. She then asked another nurse if Jackson was in fact a lesbian. At this time, Shanks entered the conversation and proceeded to touch or grab Saville's buttocks. Saville then told Shanks not to do this, but he allegedly did so again, after which Saville struck Shanks across his chest. This incident was observed by Dr. Carson and others. Shanks does not dispute that the incident occurred, although he asserts that he acted in a joking manner and that he only touched Saville's thigh area. Saville reports that she was humiliated and angry, particularly because she observed the others present, including Dr. Carson, laughing at her. Saville was seen crying after this incident. Saville further reports that she confronted Shanks shortly after the incident and explained how offended she was and that

Shanks responded by telling her that she was in trouble in her clinical work.

Saville reported the incident to Linda Callahan, and the incident was then reported to Shanks's supervisor, Ilse Cantey. Dr. Carson also submitted a memorandum to Cantey describing the incident. Cantey then counseled Shanks about his behavior and warned him that further behavior would result in his termination; it is disputed whether Shanks was warned about sexual harassment before this incident. Dr. Carson also counseled Shanks independently, and Shanks received a written warning. Saville reports that she was assured by Cantey that she would no longer have to work directly with Shanks. The parties dispute whether the Cummins School had a written sexual harassment policy, but Shanks admits that he had never seen nor heard of one and received no training in this area.

Following June 7, 1991, Saville admits that Shanks behaved as a "perfect gentleman" in terms of physical conduct. She alleges, however, that Shanks retaliated against her by downgrading her in clinical evaluations. Evaluations of Saville's clinical performance did, indeed, become increasingly negative. The parties dispute whether this was caused by Shanks's input and Saville's inability to perform in a hostile and retaliatory work environment, as Saville alleges, or by Saville's true inability to perform in the clinical area, as the defendants allege. Saville alleges that director Holliday refused to assign Saville to supervisors other than Shanks and, indeed, appointed Shanks as one of her periodic evaluators.

In September 1991, Saville received a written warning from the "evaluation committee" because of problems with her performance; the warning listed areas of "critical weakness" including flexibility in planning and implementing an anesthesia care plan; independence and initiative in providing care; safe and efficient start of cases and delivery of anesthesia; early recognition and appropriate response to critical incidents; and thorough and timely record keeping.

3. Saville Depo., at 73–74.

4. Saville Depo., at 80.

On or about October 8, 1991, the evaluation committee placed Saville on a 30–day clinical probation; the committee provided her with weekly feedback and counseling about her progress during the probation and offered to meet with her. On November 21, 1991, her clinical probation was extended for 30 days. Finally, on January 6, 1992, the evaluation committee unanimously voted to dismiss Saville from the nurse anesthetist program because of her lack of progress. On January 7, 1992, Saville invoked the school's grievance procedure to challenge her dismissal.

Saville was present throughout the grievance procedure, was allowed to cross-examine witnesses, and was allowed to make a closing statement. She was not permitted, however, to be represented by counsel or to have the entire faculty consider her dismissal. It appears that other grievance procedures outlined in the student handbook were not adhered to by the institutional defendants, although they respond that these procedures had been superseded by the evaluation process implemented by Holliday. Although the handbook listed a "deferment of graduation" option, this option was not recommended for Saville. Saville filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) and subsequently filed this federal lawsuit.

## II. DISCUSSION

### A. *Motions for Summary Judgment*

#### 1. *Summary Judgment Standard*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Once the party seeking summary judgment has informed the court of the basis for its motion, the burden shifts to the non-moving party to demonstrate why summary judgment would be inappropriate. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *see also Fitzpatrick v. City of Atlanta,* 2 F.3d

1112, 1115–17 (11th Cir.1993) (discussing how the responsibilities on the movant and the nonmovant vary depending on whether the legal issues, as to which the facts in question pertain, are ones on which the movant or nonmovant bears the burden of proof at trial).

### 2. *Title VII and Title IX*

Saville brings this action against Shanks, in both his individual and official capacities, under Title VII and against the institutional defendants under both Title VII and Title IX.[5] She alleges two forms of employment discrimination: sexual harassment and retaliation. Under Saville's sexual harassment claim, she argues both that she was required to work in a hostile work environment and that she was subjected to *"quid pro quo"* sexual harassment. The institutional defendants argue that the substantive standards to be applied to the claims under Title IX should be the same as those under Title VII, relying on *Lipsett v. University of Puerto Rico,* 864 F.2d 881, 901 (1st Cir.1988) (additional cases cited in opinion). Saville does not appear to dispute this approach, and the court is in agreement. Accordingly, Saville's claims against the institutional defendants under Title IX will be analyzed along with her Title VII claims.

#### a. *Timeliness of EEOC Charge*

■ Before addressing Saville's substantive claims, the court must first address whether Saville has satisfied Title VII's requirement of filing a timely charge with the EEOC on her sexual harassment claims. The institutional defendants assert that she has not done so because she filed her EEOC charge on March 2, 1992, more than 180 days after the alleged single incident of sexual harassment by Shanks on June 7, 1991. Title VII requires the filing of a charge within 180 days "after the alleged unlawful employment practice occurred." 42 U.S.C.A. § 2000e–5(e). Saville responds that the sexual harassment was a continuing violation which culminated in her discharge. It is

---

**5.** *See* Plaintiff's Supplemental Response to Defendants' First Set of Interrogatories. Because Saville does not proceed against Shanks under Title IX, his request for summary judgment as to the Title IX claims against him is denied as moot.

undisputed that the discharge itself fell within the 180–day period.

The court agrees with Saville. In *Beavers v. American Cast Iron Pipe Co.*, 975 F.2d 792 (11th Cir.1992), the Eleventh Circuit Court of Appeals held that "Where an employee charges an employer with continuously maintaining any illegal employment practice, he may file a valid charge of discrimination based upon that illegal practice until 180 days after the last occurrence of an instance of that practice." *Id.* at 796 (quoting *Gonzalez v. Firestone Tire & Rubber Co.*, 610 F.2d 241, 249 (5th Cir.1980)). In contrast, "where the employer engaged in a discrete act of discrimination more than 180 days prior to the filing of a charge with the EEOC by the employee, allegations that the discriminatory act continues to adversely affect the employee or that the employer presently refuses to rectify its past violation," the charge must be filed within 180 days of the discrete act. *Id.*

In this case, Saville has alleged a chain of violations stemming from sexual harassment by her employer, commencing with statements and physical touching by Shanks, creating a hostile work environment, and continuing until the time of her dismissal. Thus, although the statements and touching by Shanks may have ceased on June 7, 1991, the alleged sexual harassment violation continued in the form of a hostile work environment through the time of Saville's termination. In other words, the sexual harassment violation itself continued actively, not just the "present consequences" of a discrete act. The court concludes, therefore, that Saville's allegations, if shown to violate Title VII, constitute a continuing violation. Accordingly, her sexual harassment allegations are properly before this court.[6]

### b. *Individual Liability of Shanks*

■ The court must next address Shanks's contention that all Title VII claims against him in his individual capacity are due to be dismissed. In support of his request, Shanks relies on an opinion rendered by the Eleventh Circuit Court of Appeals prior to the 1991 amendments: *Busby v. City of Orlando*, 931 F.2d 764 (11th Cir.1991) (per curiam). There, the court wrote that, "Individual capacity suits under Title VII are ... inappropriate." *Id.* at 772. The court explained that, "The relief granted against Title VII is against the *employer*, not individual employees whose actions would constitute a violation of the Act," and "the proper method for a plaintiff to recover under Title VII is by suing the employer, either by naming the supervisory employees as agents of the employer or by naming the employer directly." *Id.* (internal citations omitted) (emphasis in original).[7] The import of *Busby* is that, even though Congress defined "employer" to include "any agent," 42 U.S.C.A. § 2000e(b), this provision does not impose individual liability but only holds the employer accountable for the acts of its individual agents.[8]

Saville argues that the rule in *Busby* is no longer good law because of the passage of the 1991 amendments.[9] Specifically, she points to the provision of the 1991 amend-

---

6. In making this determination, the court is not reaching the merits of Saville's sexual harassment claims, but only holding that the allegations, if proved, constitute a continuing violation. The question of whether there are genuine issues of material fact to send these allegations to the jury is taken up below.

7. A split of opinion exists among circuit courts of appeals on the question of whether an individual can be held liable under Title VII as it existed prior to the 1991 amendments. *See Bertoncini v. Schrimpf*, 712 F.Supp. 1336, 1339–40 (N.D.Ill. 1989) (collecting cases). *Busby* aligned the Eleventh Circuit with those courts holding that no individual liability exists. In adopting this rule, the *Busby* court specifically relied on the Fifth Circuit's decision in *Harvey v. Blake*, 913 F.2d 226, 227–28 (5th Cir.1990), which had reached the same conclusion.

8. An employer can be held liable under Title VII for the discriminatory actions of its employees under either of two theories: agency or respondeat superior. *See Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554, 1557 (11th Cir.1987). Under either theory, however, it is the employer who is held liable under Title VII, not the offending employee. The offending employee, of course, may be held liable under causes of action other than Title VII, such as state-law tort claims.

9. Saville essentially concedes that *Busby* would preclude an individual-capacity suit under Title VII brought before the effective date of the 1991 amendments.

ments that allows a Title VII plaintiff who can prove intentional discrimination to recover compensatory and punitive damages: 42 U.S.C.A. § 1981a(a)(1).[10] Prior to the effective date of this provision, a plaintiff could seek only such relief as reinstatement, backpay, and other equitable relief; according to Saville, the employer, and not the individual employee, was then in a better position to provide such relief and individual liability was not appropriate. Saville contends that, because an individual employee can satisfy an award of monetary damages and because she seeks compensatory and punitive damages, *Busby* should not apply to her claim against Shanks under Title VII as amended by the Civil Rights Act of 1991. Saville relies on the case of *Wilson v. Gillis Advertising Co.,* 1993 WL 503117 (N.D.Ala.1993), in which the court, for the reasons urged by Saville, held that *Busby* did not survive the 1991 amendments and allowed the plaintiff to amend her complaint to seek individual-capacity relief.

The *Wilson* court adopted the reasoning of the court in *Bridges v. Eastman Kodak Co.,* 800 F.Supp. 1172 (S.D.N.Y.1992). In *Bridges,* the court wrote that, "Since [compensatory and punitive] damages are of a type that an individual can be expected to pay, there appears little reason" to preclude Title VII suits against individuals. *Id.* at 1180. The *Wilson* court predicted that the Eleventh Circuit would adopt the reasoning of *Bridges* when it considered the issue. 1993 WL at 503117, *2. The court in *Bridges,* however, was on a significantly dif-

ferent footing from that of the *Wilson* court because it assumed that, in the Second Circuit, a plaintiff could seek relief against an individual under Title VII; thus, the availability of compensatory and punitive damages merely provided an additional basis for the *Bridges* court to conclude that Title VII authorized individual liability. *Bridges,* 800 F.Supp. at 1180. The court in *Wilson,* by contrast, relies on the availability of compensatory and punitive damages as the sole basis for concluding that *Busby*—the law in the Eleventh Circuit at this time—is no longer valid.

For the reasons recently given in *Smith v. Capitol City Club of Montgomery,* 850 F.Supp. 976 (M.D.Ala.1994) (Thompson, J.), the court disagrees with the holding in *Wilson* and believes that the Eleventh Circuit, when it is faced with the issue, will hold that *Busby* remains good law, notwithstanding the availability of damages that an individual defendant can provide.[11] In reaching its conclusion in *Smith,* this court was guided by the reasoning of the Ninth Circuit Court of Appeals—the first and only circuit squarely to address Saville's argument—in *Miller v. Maxwell's Intern., Inc.,* 991 F.2d 583 (9th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1049, 127 L.Ed.2d 372 (1994). Prior to the amendment of Title VII by the Civil Rights Act of 1991, the Ninth Circuit held, as did the Eleventh Circuit in *Busby,* that individuals could not be held liable under Title VII. Thus, the decision in *Miller*—that no individual liability exists under Title VII even

---

**10.** Section 1981a(a)(1) provides:

"In an action brought by a complaining party under section 706 or 717 of the Civil Rights Act of 1964 (42 U.S.C. 2000e–5) [42 U.S.C.A. § 2000e–5 or 42 U.S.C.A. § 2000e–16] against a respondent who engaged in unlawful intentional discrimination (not an employment practice that is unlawful because of its disparate impact) prohibited under section 703, 704, or 717 of the Act (42 U.S.C. 2000e–2 or 2000e–3) [42 U.S.C.A. § 2000e–2, 42 U.S.C.A. § 2000e–3, or 42 U.S.C.A. § 2000e–16], and provided that the complaining party cannot recover under section 1981 of this title, the complaining party may recover compensatory and punitive damages as allowed in subsection (b) of this section, in addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964 [42 U.S.C.A. § 2000e–5(g)], from the respondent."

**11.** The Eleventh Circuit reaffirmed the *Busby* rule in another case addressing Title VII prior to the 1991 amendments. In *Yeldell v. Cooper Green Hosp., Inc.,* 956 F.2d 1056 (11th Cir.1992), the court wrote that "[Title VII] suits may be brought only against individuals in their official capacity and/or the employing entity." *Id.* at 1060.

Both *Busby* and *Yeldell* addressed the question of individual liability in the *public* employment context. The *Wilson* court suggested that the rule in *Busby* does not necessarily preclude individual liability in the *private* employment context. 1993 WL at 503117, *1. While the Eleventh Circuit has not specifically held that there is no individual liability under Title VII in the private employment context, this court believes that *Busby*'s holding that there is no individual liability under Title VII applies equally in the private employment context.

after the effective date of the 1991 amendments—is a more logically persuasive one for this court than the *Bridges* decision relied on in *Wilson.*

The *Miller* court found two bases from which to conclude that Congress did not intend, either before or after the 1991 amendments, to impose individual liability on employees. First, the *Miller* court relied on the fact that Title VII has always limited liability to employers with 15 or more employees. 42 U.S.C.A. § 2000e(b). The court concluded from this limitation that "Congress did not want to burden small entities with the costs associated with litigating discrimination claims." *Id.* at 587. "If Congress decided to protect small entities with limited resources from liability," the court continued, "it is inconceivable that Congress intended to allow civil liability to run against individual employees." *Id.* This court similarly finds no basis to conclude from the statutory scheme that Congress intended to exempt small employers but impose liability on individual employees.[12] *Cf. Rogero v. Noone,* 704 F.2d 518, 520 (11th Cir.1983) ("because Noone had fewer than fifteen employees, he was 'not an employer within the definition of 42 U.S.C.A. § 2000e, either individually or as Tax Collector, and thus, the plaintiff's Title VII action against Defendant Noone [could not] be maintained' ").

Second, the *Miller* court also addressed the availability of compensatory and punitive damages under the 1991 amendments. The amendments placed caps on the availability of damages and based these caps on the size of the employer's workforce. 42 U.S.C.A. § 1981a(b)(3)(A–D).[13] Again, Congress provided that there would be no liability for an employer with fewer than 15 employees. This court agrees with the *Miller* court's conclusion that, "if Congress had envisioned individual liability under Title VII for compensatory and punitive damages, it would have included *individuals* in this litany of limitations and would have discontinued the exemption for small employers." *Miller,* 991 F.2d at 588 n. 2 (emphasis in original). Moreover, the law in the Eleventh Circuit has been settled that there is no individual liability under Title VII; the fact that Congress made available compensatory and punitive damages—without changing the definition of employer and without discontinuing the exemption for small employers—does not provide this court with a reason to believe that Title VII now imposes individual liability. A number of district courts considering individual liability under Title VII have reached the same conclusion. *See Lowry v. Clark,* 843 F.Supp. 228, 231, (E.D.Ky.1994) ("the placing of [ ] damage limitations upon employers based on the number of employees indicates that Congress did not intend to permit recoveries against individual employees for such damages"); *Stafford v. State,* 835 F.Supp. 1136, 1149 (W.D.Mo.1993) ("A Title VII claim may not be brought against a supervisory employee in his/her individual capacity"); *see also Johnson v. Northern Indiana Public Service Co.,* 844 F.Supp. 466, 469 (N.D.Ind.1994); *Henry v. E.G. & G. Missouri Metals Shaping Co., Inc.,* 837 F.Supp.

---

12. One court, in declining to adopt the analysis of the *Miller* court, has concluded that the exemption for small employers was not intended to exempt all "small entities," but rather "small family-run businesses" in order to protect them "from discriminatory hiring claims based on their preference for hiring friends and relatives." *Lamirande v. Resolution Trust Corp.,* 834 F.Supp. 526 (D.N.H.1993). Congress, however, excluded a category of employers on the basis of their size—"small entities"—and not on the basis of whether a business was family-run. This court agrees with the *Miller* court that Congress intended to exempt small entities, and by logical extension, individual employees.

13. The amendments limit damages as follows: "The sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed, for each complaining party—

(A) in the case of a respondent who has more than 14 and fewer than 101 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $50,000;

(B) in the case of a respondent who has more than 100 or fewer than 201 employees ..., $100,000;

(C) in the case of a respondent who has more than 200 and fewer than 501 employees ..., $200,000; and

(D) in the case of a respondent who has more than 500 employees ..., $300,000."

312, 314 (E.D.Mo.1993); *Pelech v. Klaff–Joss, LP,* 828 F.Supp. 525, 529 (N.D.Ill.1993).

Finally, as this court explained in *Smith,* there is a simple practical consideration that counsels against individual liability: Congress could not have intended the odd circumstances that would result from a scheme of individual liability. First, such a scheme would, presumably, base the amount of damages against an offending employee on the size of the employer for whom he or she works. While gearing the amount of damages to the size of the employer makes sense if the employer is the party to be held liable, it makes no sense if it is the individual who is to be held liable. Under such a scheme, a plaintiff could recover $50,000 from an offending supervisor at a company with 15 to 100 employees, but $300,000 from an offending supervisor at a very large corporation—even if both supervisors earn the same salary and engaged in identical discriminatory conduct. Second, the damage caps envision a unity of liability: "The sum of the amount of ... damages ... shall not exceed [a certain sum], ... in the case of *a respondent*" of a certain size. 42 U.S.C.A. § 1981a(b)(3) (emphasis added). If both the offending employee and the employer were to be liable for monetary damages, Congress would have provided some guidance as to how damages should be apportioned, or, whether a plaintiff could collect the cap amount from both the employer and the individual. And if the discrimination against the plaintiff involved several co-employees, would each be liable for the cap amount, based on the size of the employer? Had Congress intended individual liability, it would not have left these questions unanswered and would have incorporated individual liability into the damage limitation scheme in some manner, perhaps by establishing individual damage caps. The court is convinced that the damage caps as they exist indicate Congress's intent that a plaintiff collect damages one time from the employer itself. Thus, even though compensatory and punitive damages are the type of relief an individual could provide—and a type of relief that might very well further the purposes of Title VII—the 1991 amendments to Title VII do not authorize this court to hold an individual liable for such damages.

The court, therefore, must grant Shanks's request to the extent Saville seeks relief against him in his individual capacity under Title VII. Saville may, however, proceed under Title VII against Shanks in his official capacity. *See Busby,* 931 F.2d at 772.

The court notes, as it did in *Smith,* that a plaintiff's inability to seek monetary damages from the offending employee will not, in the bulk of cases, make a practical difference. The employer can still be held liable for the acts of its employees, assuming such liability is established under a theory of agency or respondeat superior. Thus, the court's decision to dismiss Shanks in his individual capacity in no way affects Saville's ability to collect from her former employer for any discriminatory actions of Shanks which she can prove, again assuming that Shanks was acting as the employer's agent or that the employer is otherwise liable under a theory of respondeat superior. The court does not, therefore, believe that Title VII's remedial purposes will be frustrated by this holding. As the *Miller* court wrote, "No employer will allow supervisory or other personnel to violate Title VII when the employer is liable for the Title VII violation." 991 F.2d at 588. "An employer that has incurred civil damages because one of its employees believes he can violate Title VII with impunity will," the court continued, "quickly correct that employee's erroneous belief." *Id.*

As admitted in *Smith,* there are, at least, two possible situations in which a denial of individual liability might make a practical difference—where an employer goes bankrupt and where it is necessary to "pierce the corporate veil" to gain access to the assets of an individual owner, officer, or director. *See, e.g., Janopoulos v. Harvey L. Walner & Associates, Ltd,* 835 F.Supp. 459, 461–62 (N.D.Ill.1993); *Vakharia v. Swedish Covenant Hosp.,* 824 F.Supp. 769, 785–86 (N.D.Ill. 1993). However, because these circumstances are not presented here, the court need not decide whether and when an exception to the rule against individual liability should exist.

c. *Sexual Harassment*

Saville has brought sexual harassment claims against Shanks and the institutional

defendants, alleging violations of both Title VII and Title IX.[14] She claims that she has been a victim of both *quid pro quo* harassment and hostile work environment harassment. The Eleventh Circuit has explained that, "*Quid pro quo* sexual harassment occurs when an employer alters an employee's job conditions as a result of the employee's refusal to submit to sexual demands," and that, "Hostile environment sexual harassment occurs when an employer's conduct 'has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive environment.'" *Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1315 (11th Cir.1989) (quoting *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986)) (citations omitted).

■ The court will first address Saville's hostile work environment claim. To establish a prima facie case of hostile work environment harassment, an employee must prove: "(1) that the employee belongs to a protected group; (2) that the employee was subject to 'unwelcome' sexual harassment; (3) that the harassment complained of was based on sex; and (4) that the harassment complained of affected a 'term, condition, or privilege' of employment in that it was sufficiently severe or pervasive 'to alter the conditions of the [victim's] employment and create an abusive working environment.'" *Sparks v. Pilot Freight Carriers, Inc.,* 830 F.2d 1554, 1557 (11th Cir.1987) (quoting *Henson v. Dundee,* 682 F.2d 897, 903 (11th Cir.1982)) (internal citations omitted). Saville has presented sufficient evidence to withstand summary judgment on the first three factors: Saville is a woman, who allegedly suffered comments and physical contact

based on her sex, and she found this harassment to be unwelcome.[15]

■ In considering the fourth factor, the Supreme Court recently explained that, "whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.,* —— U.S. ——, ——, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993). Saville has presented sufficient evidence to withstand summary judgment on the fourth factor as well. She alleges that she was touched and humiliated by Shanks—including being grabbed in the buttocks—in the presence of others on two separate occasions. She alleges instances in which she was subject to sexual innuendo and advances by Shanks. She says that she was called a lesbian by Shanks in the presence of others, a sexual orientation she found to be strange and humiliating. Saville's work performance declined, and it is a reasonable inference that a hostile work environment was the cause of her poor work performance.

■ Finally, the court rejects defendants' contention that it is undisputed that any hostile environment ended after June 7, 1991, the date of the last alleged incident, and the only one to which the defendants admit. It is reasonable to conclude that a hostile environment would not cease to exist immediately, but rather that the environment would remain hostile for some period of time thereafter. It is for the jury to decide when the

---

14. Sexual harassment has been held to violate Title VII's prohibition of employer discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's sex...." 42 U.S.C.A. § 2000e–2(a)(1). *See Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311 (11th Cir.1989).

15. In determining whether the conduct was "unwelcome," the "focus of the court should be on

whether the complainant 'by her conduct indicated that the alleged sexual advances were unwelcome, not whether her actual participation ... was voluntary.'" *Sims v. Montgomery County Comm'n,* 766 F.Supp. 1052, 1068 (M.D.Ala.1990) (Thompson, J.) (quoting *Meritor Savings Bank,* 477 U.S. at 68, 106 S.Ct. at 2406). Saville's conduct—telling Shanks to stop and reporting the incidents to co-workers and her supervisor—raises a factual question as to whether she did not welcome the conduct.

alleged hostile environment ceased to exist, if at all prior to Saville's discharge.

■ The court now turns to Saville's allegations of *quid pro quo* harassment and again finds that she has presented sufficient evidence to withstand summary judgment. After the incident of June 7, 1991, Saville confronted Shanks. Shanks showed no remorse, and instead allegedly stated that Saville was in trouble clinically. Shanks's statement emphasized the fact that he had the power to evaluate Saville's clinical performance. When Saville reported this incident and Shanks was reprimanded, Saville's clinical evaluations did in fact deteriorate with Shanks as a frequent evaluator of her work. On the basis of these subsequent evaluations, Saville was ultimately discharged. While the court in no way concludes that there was a causal link, it does conclude that such an inference is reasonable. While this is not the classic *quid pro quo* case, a jury could conclude that Shanks's poor evaluations, and ultimate discharge, resulted from her refusal to acquiesce in Shanks's sexual innuendo and touching. The court concludes, therefore, that the conduct alleged by Saville—the relevant facts of which remain in dispute—is sufficient to withstand a summary judgment request on the *quid pro quo* harassment claim.

■ The court now turns to the question of the institutional defendants' liability for the alleged sexual harassment. In *Sims v. Montgomery County Comm'n*, 766 F.Supp. 1052 (M.D.Ala.1990) (Thompson, J.), this court reviewed the standards for corporate liability. 766 F.Supp. at 1068–70. Although the Supreme Court has explained that an employer is not "automatically liable" for all sexual harassment inflicted by its employees, *Meritor Savings Bank*, 477 U.S. at 72, 106 S.Ct. at 2408, it "may be held *directly* liable for any illegal harassment that either it or its agents may have practiced on its employees." *Sims*, 766 F.Supp. at 1068. To hold the institutional defendants directly liable for Shanks's conduct under either or both forms of sexual harassment, Saville needs to prove

that Shanks is an agent of the institutional defendants.[16]

■ It appears undisputed that any acts of sexual harassment by Shanks were not in the "scope of his employment" such that he could be deemed an agent under traditional agency principles. As this court set forth in *Sims*, however, under the Eleventh Circuit's *Sparks* decision, a supervisor can be deemed an agent for Title VII purposes when "he [is] aided in accomplishing [the harassment] by the existence of the agency relationship." *Sparks*, 830 F.2d at 1559. The employer "is not insulated from liability by the fact that [its supervisor] was acting entirely for his own benefit." *Id.* An employer can be held liable where "it was the employer's delegation of authority that empowered the supervisor to act." *Id.* A supervisor need not be "high in the business structure" or have "the authority to hire, fire, or promote" to be considered an agent; an agent may be a supervisor who is "merely in the business's intermediate structure." *Sims*, 766 F.Supp. at 1069. Finally, "whether a person is in a position to be considered an agent for Title VII purposes is a factual issue for the factfinder." *Id.*

Saville has established a genuine issue of material fact as to whether Shanks was acting as an agent of the institutional defendants when he engaged in the alleged sexual harassment of Saville. Shanks was employed as an instructor by the institutional defendants. He supervised and evaluated Saville's clinical work; the institutional defendants appear to have relied on his evaluations. After Saville complained to the director of the Cummins School about a comment Shanks allegedly made to her, and stated that she did not want the director to discipline Shanks because she was afraid it would hurt her in school, the director did not assure her that Shanks had no authority to affect her status. Saville believed Shanks had authority over her, and the institutional defendants appear to have held him out as having such authority. Because Saville has presented sufficient evidence to raise a disputed issue as to Shanks's status as an agent, the institutional defendants' request for sum-

---

**16.** Title VII defines the term "employer" to in- clude its "agent." 42 U.S.C.A. § 2000e(b).

mary judgment on the sexual harassment claims will be denied.

■■■ Because there is sufficient evidence for Saville to withstand summary judgment on both the *quid pro quo* and hostile environment harassment claims and on the question of whether Shanks was the institutional defendants' agent, it is unnecessary to decide whether the institutional defendants could be held *indirectly* liable. In a case of "pure" hostile environment harassment, without any showing of *quid pro quo,* an employer is only liable under a theory of *respondeat superior,* that is, "where the corporate defendant knew or should have known of the harassment and failed to take prompt remedial action against the supervisor." *Steele,* 867 F.2d at 1316. Although it is unnecessary to decide whether the institutional defendants can be liable under *respondeat superior,* the court notes that there would also be a genuine issue of material fact as to whether the institutional defendants could be held indirectly liable. While the institutional defendants reprimanded Shanks, it appears to be a disputed issue whether this qualifies as "prompt remedial action." "Prompt remedial action" must be *effective* action in order to exempt an employer from liability. Here, although the alleged verbal and physical harassment appears to have ceased on June 7, 1991, the institutional defendants continued to require Saville to work under and be evaluated by Shanks. As noted above, it is a question for the jury whether this continued to be a hostile work environment for Saville. Accordingly, it is disputed whether the institutional defendants effectively remedied the situation of which they had knowledge.[17]

■■■ The court also rejects the institutional defendants' contention that they would be entitled to summary judgment on *respondeat superior* liability because they had an "explicit policy against sexual harassment,"

*Sims,* 766 F.Supp. at 1070, and effective grievance procedures "calculated to encourage victims of harassment to come forward" not used by the plaintiff. *Meritor Savings Bank,* 477 U.S. at 73, 106 S.Ct. at 2408. The parties dispute the existence of a sexual harassment policy, especially whether such a policy was made known to the employees. Shanks himself admits that he was unaware of any such policy. Any grievance procedures available to Saville appear to have been *ad hoc,* and it is disputed as to whether or not her reporting of the incidents was effective.

The court concludes, therefore, that the institutional defendants' request for summary judgment on sexual harassment—both *quid pro quo* and hostile environment, and whether premised on direct or indirect liability—will be denied.

#### d. *Retaliation*

■■■ Saville charges that the defendants retaliated against her in violation of Title VII.[18] She alleges that they judged her work more harshly and ultimately discharged her from the nurse anesthesia program because of her opposition to the unlawful employment practice of sexual harassment. A prima facie case of retaliation under Title VII is a showing of (1) participation in actions protected by the statute; (2) an adverse employment action; and (3) a causal link between the protected actions and the adverse employment decision. *Hamm v. Members of the Bd. of Regents of State of Florida,* 708 F.2d 647, 654 (11th Cir.1983).

■■■ Saville's report to a superior about Shanks's conduct is the type of activity protected by Title VII. The institutional defendants' decisions to place Saville on probationary status and then to discharge her from the nurse anesthesia program qualify as adverse employment actions. To present a pri-

---

17. It is disputed whether the institutional defendants reprimanded Shanks for sexual harassment in the past. If such prior knowledge of his conduct were shown, forcing Saville to continue to work with him would appear all the more ineffective.

18. Title VII provides, in relevant part:

"It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice ... or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."
42 U.S.C.A. § 2000e–3(a).

■ facie case, therefore, Saville must show that there is a causal link between her opposition to Shanks's conduct and her ultimate termination.

The Eleventh Circuit has explained its interpretation of the "causal link" prong as follows:

> "We do not construe the 'causal link' in the [prima facie case] formula to be the sort of logical connection that would justify a prescription that the protected participation in fact prompted the adverse action. Such a connection would rise to the level of direct evidence of discrimination shifting the burden of persuasion to the defendant. Rather, we construe the 'causal link' element to require merely that the plaintiff establish that the protected activity and the adverse action are not wholly unrelated."

*Simmons v. Camden County Bd. of Educ.,* 757 F.2d 1187, 1189 (11th Cir.), *cert. denied,* 474 U.S. 981, 106 S.Ct. 385, 88 L.Ed.2d 338 (1985); *see also Weaver v. Casa Gallardo, Inc.,* 922 F.2d 1515, 1525 (11th Cir.1991); *Bigge v. Albertsons, Inc.,* 894 F.2d 1497, 1501 (11th Cir.1990). Saville alleges that the causal connection between her complaint and ultimate termination occurred through the appointment of Shanks by the institutional defendants—her alleged harasser who knew she had complained against him—to her evaluation team shortly after her complaint. She alleges that, in this environment, she was unable to work to the best of her ability and also that she was unfairly downgraded by Shanks. The evaluation team subsequently put Saville on probation and she was ultimately discharged on the basis of the team's recommendation. The appointment of Shanks to the evaluation committee raises a sufficient question of a causal link between Saville's complaint and ultimate termination. The court finds, therefore, that Saville has established a prima facie case. Under the framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the "[e]stablishment of a prima facie case in effect creates a presumption that the employer unlawfully

discriminated against the employee." *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981).

■ In Title VII cases, the burden of production then shifts to the defendant to show that the adverse employment actions were taken for a "legitimate, nondiscriminatory reason." *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094. The institutional defendants argue that they have come forward with such a legitimate, non-discriminatory reason for discharging Saville from the nurse anesthesia program: she was discharged solely on the basis of her poor clinical evaluations which have been documented in the record. As the Supreme Court has recently explained in *St. Mary's Honor Center v. Hicks,* —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), the defendants' burden is one of production only, not persuasion. Once a defendant has articulated a nondiscriminatory reason, as the institutional defendants have done in this case, the presumption in favor of the plaintiff has been rebutted and disappears. *Id.* at ——, 113 S.Ct. at 2749.

■ The disappearance of the presumption, however, does not compel summary judgment in favor of a Title VII defendant, as the institutional defendants assert.[19] The "ultimate question" remains the same: whether the plaintiff can persuade the trier of fact that she has been the victim of intentional discrimination. *St. Mary's Honor Center,* —— U.S. at ——, 113 S.Ct. at 2748–49. A plaintiff may persuade the factfinder that the proffered reason for the employment decision is a pretext for intentional discrimination. The "factfinder's disbelief of the reasons put forward by the defendant" can, along with the elements of the prima facie case, suffice to prove intentional discrimination. *Id.* at ——, 113 S.Ct. at 2749.

There is a genuine issue of material fact on the retaliation claim. There is a disputed issue as to whether Shanks unfairly downgraded Saville and also as to whether Saville's performance in an allegedly hostile work environment was the best that she

---

**19.** Rather, rebutting the presumption saves the defendant from summary judgment in favor of the plaintiff.

could do. If Saville is successful in establishing either of these scenarios, a jury could reasonably find that the institutional defendants' articulated reason of "poor clinical performance" was neither legitimate nor non-discriminatory. To hold otherwise would allow the institutional defendants to escape liability solely on the basis of poor clinical evaluations, without affording Saville the opportunity to persuade the factfinder that the poor clinical evaluations were themselves the result of discrimination. In other words, the institutional defendants would be in a better defensive posture *because* their discriminatory actions caused Saville to perform poorly. Because the cause of Saville's poor performance is disputed, the question of whether Saville's discharge was based on legitimate, nondiscriminatory reasons is a question for the jury. As the Supreme Court explained in *St. Mary's Honor Center,* even in the absence of proof beyond the establishment of the prima facie case, "rejection of the defendant's proffered reasons, will *permit* the trier of fact to infer the ultimate fact of intentional discrimination." *Id.* at ——, 113 S.Ct. at 2749.[20] Defendants' request for summary judgment on retaliation, therefore, will be denied. Saville's claims under Title VII will go forward against Shanks in his official capacity, and her Title VII and Title IX claims will proceed against the institutional defendants.

### 3. *Section 1983*

Saville charges Shanks and the institutional defendants with violation of her rights to equal protection, free speech, and due process of law as enforced by § 1983.

#### a. *Equal Protection*

Saville alleges that defendants' sexual harassment of her violated her constitutional right to equal protection as enforced by § 1983.[21] Shanks responds that he is entitled to qualified immunity for his actions. The court agrees that Shanks is entitled to such immunity, but only in part. The doctrine of qualified immunity insulates govern-

ment officials from personal liability for money damages for actions taken in good faith pursuant to their discretionary authority. *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Greason v. Kemp,* 891 F.2d 829, 833 (11th Cir.1990). As established by the Supreme Court in *Harlow,* the test for "good faith" or qualified immunity turns primarily on the objective reasonableness of the official's conduct in light of established law: "governmental officials ... generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. at 818, 102 S.Ct. at 2738. Where the law that the defendant allegedly violated was not clearly established at the time of the alleged offense, the defendant is entitled to qualified immunity. *Harlow,* 457 U.S. at 807, 102 S.Ct. at 2732; *Stewart v. Baldwin County Bd. of Educ.,* 908 F.2d 1499, 1503 (11th Cir.1990). If the law was clearly established, however, the immunity defense will fail since "a reasonably competent public official should know the law governing his conduct." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738.

The Eleventh Circuit follows a two-step analysis to determine whether a public official is entitled to qualified immunity. *Sims v. Metropolitan Dade County,* 972 F.2d 1230, 1236 (11th Cir.1992). First, the defendant must prove that he was acting within the scope of his discretionary authority at the time of the allegedly unconstitutional conduct. *Id.* Once this is shown, the burden shifts to the plaintiff to prove that the defendant's actions violated clearly established statutory or constitutional law. *Id.; Busby,* 931 F.2d at 773; *Dartland v. Metropolitan Dade County,* 866 F.2d 1321, 1322 (11th Cir. 1989).

The parties do not address whether Shanks's actions were discretionary. Assuming *arguendo* that they were, the court will address the second prong of the analysis:

---

**20.** Furthermore, Saville need not prove that retaliation was the only reason for her discharge, but rather that it was a "significant factor in the employer's decision." *Bigge,* 894 F.2d at 1501.

**21.** To the extent that Saville raises a § 1983 claim for retaliation against her because she complained about the sexual harassment, this claim is addressed below as a free speech claim.

whether Shanks's actions violated clearly established law. This prong poses two distinct questions: first, whether the right claimed by Saville was clearly established at the time of Shanks's conduct; and, second, whether there is a genuine issue of fact as to whether Shanks's conduct violated the clearly established right. *Rich v. Dollar,* 841 F.2d 1558, 1564 (11th Cir.1988). The court will first determine if Saville's right under the equal protection clause was clearly established for purposes of qualified immunity.

■■■■ In order for a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violated that right." *Lowe v. Aldridge,* 958 F.2d 1565, 1570 (11th Cir.1992) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of preexisting law, the unlawfulness must be apparent." *Id.* In determining the state of the law, this court must look to "the law originating in [the Eleventh] Circuit, as well as the Supreme Court, the courts of appeals, and the district courts." *Leeks v. Cunningham,* 997 F.2d 1330, 1333 (11th Cir.), *cert. denied,* ‒‒‒ U.S. ‒‒‒‒, 114 S.Ct. 609, 126 L.Ed.2d 573 (1993); *Greason,* 891 F.2d at 833. Therefore, for Saville to defeat Shanks's request for summary judgment on qualified-immunity grounds, she must show that the right she is claiming was "clear, factually-defined, [and] well-recognized" at the time of Shanks's conduct in 1991 and early 1992. *Dartland,* 866 F.2d at 1321; *see also Bates v. Hunt,* 3 F.3d 374, 379 (11th Cir.1993). More specifically, the question for the court is whether case law was clearly established in 1991 that Saville had a right under the equal protection clause to be free in the governmental workplace from the type of sexual harassment allegedly engaged in by

Shanks, her supervisor, namely, being grabbed in the buttocks, told about his sex life, and downgraded because she refused to "play along" with his sexual conduct and innuendos.

■■■ Sexually harassing conduct similar to that allegedly engaged in by Shanks has been consistently and repeatedly held to be a form of sex discrimination proscribed by Title VII. *Meritor Savings Bank,* 477 U.S. at 73, 106 S.Ct. at 2408 (sexual harassment can constitute sex discrimination for Title VII purposes). Several decisions by the Eleventh Circuit Court of Appeals hold that conduct similar to Shanks's alleged conduct violates Title VII. For example, in *Sparks,* the Eleventh Circuit held that unwelcome sexual advances and touching is actionable sexual harassment under Title VII. 830 F.2d at 1557; *see also Steele,* 867 F.2d 1311, 1315; *Huddleston v. Roger Dean Chevrolet, Inc.,* 845 F.2d 900, 905 (11th Cir.1988); *Henson v. City of Dundee,* 682 F.2d 897, 902 (11th Cir.1982). Indeed, the Eleventh Circuit has held that sexual harassment is not only actionable under Title VII, but also that such conduct violates a plaintiff's clearly established statutory rights. *Wu v. Thomas,* 996 F.2d 271, 273 (11th Cir.1993), *cert. denied,* ‒‒‒ U.S. ‒‒‒‒, 114 S.Ct. 1543, 128 L.Ed.2d 195 (1994). Although this court must look to the equal protection clause for Saville's § 1983 right, the clear prohibition of Shanks's conduct under Title VII could provide an important analog for this court in determining whether Shanks could reasonably believe in 1991 that his conduct was legal.[22]

In addition, although the Eleventh Circuit has not held that sexual harassment is actionable under the equal protection clause, six other circuits have so held, and this court has uncovered no circuit court or standing district court decision that has held other-

---

22. In conducting this inquiry, the court looks to Saville's rights under the equal protection clause, not Title VII, because Saville bases her § 1983 claim on the equal protection clause, not Title VII. A public official does not forfeit his qualified immunity "by violating the clear command

of a statute or regulation—of federal or of state law—unless that statute or regulation provides the basis for the cause of action sued upon." *Davis v. Scherer,* 468 U.S. 183, 194 n. 12, 104 S.Ct. 3012, 3020 n. 12, 82 L.Ed.2d 139 (1984).

wise.[23] *See Woodward v. City of Worland,* 977 F.2d 1392, 1397 (10th Cir.1992) (sexual harassment by public official clearly established as a violation of equal protection clause in 1989), *cert. denied,* — U.S. —, 113 S.Ct. 3038, 125 L.Ed.2d 724 (1993); *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1478–79 (3rd Cir.1990) (denying qualified immunity to public officials who permitted and perhaps participated in sexual harassment—including abusive language, presence of pornographic pictures, anonymous telephone calls, and the placing of a lime substance inside plaintiff's shirt—because sexual harassment was clearly established as a violation of equal protection in 1986); *Starrett v. Wadley,* 876 F.2d 808, 814–15 (10th Cir.1989) (sexual harassment involving requests to meet after work at a motel, touching of buttocks and leg, and obscene gestures during working hours violates plaintiff's right to equal protection); *Poe v. Haydon,* 853 F.2d 418, 429 (6th Cir.1988) ("The case law before December 1984 established that sexual harassment by government employers would violate the rights protected by the equal protection clause"), *cert. denied,* 488 U.S. 1007, 109 S.Ct. 788, 102 L.Ed.2d 780 (1989); *Long v. Laramie County Community College Dist.,* 840 F.2d 743, 752–53 (10th Cir.) (allowing plaintiff to proceed "under §§ 1983 and 1985 on the sexual harassment theory" despite plaintiff's failure to prove Title VII claim for same conduct), *cert. denied,* 488 U.S. 825, 109 S.Ct. 73, 102 L.Ed.2d 50 (1988); *Headley v. Bacon,* 828 F.2d 1272, 1274–75 (8th Cir.1987) (permitting § 1983 claim for sexual harassment in addition to Title VII claim); *Bohen v. City of East Chicago, Ind.,* 799 F.2d 1180, 1185 (7th Cir.1986) ("Forcing women and not men to work in an environment of sexual harassment is no different than forcing women to work in a dirtier or more hazardous environment than men simply because they are women" and "Such unjustified unequal treatment is exactly the type of behavior prohibited by the equal protection clause"); *Huebschen v. Dept. of Health and Social Servs.,* 716 F.2d 1167, 1171–72 (7th Cir.1983) (although "sexual harassment ... directed solely at [a] plaintiff because she is a woman" is actionable as a violation of the equal protection clause, there was no equal protection violation because the fact that plaintiff was a former lover rather than plaintiff's gender was the motivating factor in defendant's actions); *see also King v. Board of Regents of Univ. of Wis. System,* 898 F.2d 533, 537 (7th Cir.1990); *Carrero v. New York City Hous. Auth.,* 890 F.2d 569, 577 (2nd Cir.1989); *Volk v. Coler,* 845 F.2d 1422, 1433 (7th Cir.1988). For years, district courts have also held that sexual harassment violated the equal protection clause. *See Fuchilla v. Prockop,* 682 F.Supp. 247, 255 (D.N.J.1987); *Moire v. Temple University,* 613 F.Supp. 1360, 1366 (E.D.Pa.1985), *aff'd,* 800 F.2d 1136 (3rd Cir.1986); *Gobla v. Crestwood School Dist.,* 609 F.Supp. 972, 978–79 (M.D.Pa.1985); *Estate of Scott v. deLeon,* 603 F.Supp. 1328, 1332 (E.D.Mich.1985); *Scott v. City of Overland Park,* 595 F.Supp. 520, 529 (D.Kan.1984); *Skadegaard v. Farrell,* 578 F.Supp. 1209, 1216–17 (D.N.J.1984); *Woerner v. Brzeczek,* 519 F.Supp. 517, 519–20 (N.D.Ill.1981).

Therefore, although it is unclear what degree of authority, in the absence of a Supreme Court or Eleventh Circuit decision, is sufficient to make the right to be free from sexual harassment in the workplace a clearly established one, it would appear that the number of and agreement among circuit and district court decisions would be sufficient in this case. The court cannot, however, reach this general conclusion. In several of the above cases, the courts drew a distinction between sexual harassment in general and that which could be actionable under the equal protection clause. For example, in *King v. Board of Regents of Univ. of Wis. System,* the Seventh Circuit wrote that, "In general, the [equal protection] claim follows the contours of Title VII claims." 898 F.2d at 537 (citation omitted). The court continued, however, that, "One difference between

---

**23.** Thus, the court is not presented with the situation in *Adams v. St. Lucie County Sheriff's Dept.,* 962 F.2d 1563, 1574 (11th Cir.1992) (Edmondson, J., dissenting), *approved en banc,* 998 F.2d 923 (11th Cir.1993) (per curiam), where there existed a split among the circuit courts of appeals that had been settled by the Supreme Court only a short time before the defendant's conduct. Here, all circuit courts to address the issue have been in agreement.

sexual harassment under equal protection and under Title VII ... is that the defendant must intend to harass under equal protection ... but not under Title VII." *Id. See also Andrews*, 895 F.2d at 1478–79; *Starrett*, 876 F.2d at 814–15; *Volk*, 845 F.2d at 1433; *Gobla*, 609 F.Supp. at 978–79; *Skadegaard*, 578 F.Supp. at 1216–17; *Woerner*, 519 F.Supp. at 519–20. Intentional discrimination is the only discrimination actionable under the equal protection clause. *Batson v. Kentucky*, 476 U.S. 79, 93, 106 S.Ct. 1712, 1721, 90 L.Ed.2d 69 (1986).[24] Therefore, to the extent Saville seeks to extend the equal protection clause to proscribe sexual harassment to the same extent that it is proscribed by Title VII, the court must conclude that Shanks is entitled to qualified immunity. On this point, the law is unclear.[25]

However, to the extent that Saville charges Shanks with *intentional* sexual discrimination—whether it be harassment or some other form of discrimination or whether it be prohibited by Title VII or some other anti-discrimination law—the law is settled. Under Supreme Court and Eleventh Circuit precedent, intentional discrimination against an employee in the workplace because of the employee's sex is plainly a violation of that employee's right to equal protection. The equal protection clause contains a clearly established federal constitutional right to be free from intentional sex discrimination, *Davis v. Passman*, 442 U.S. 228, 234–35, 99 S.Ct. 2264, 2271–72, 60 L.Ed.2d 846 (1979),

unless the discrimination serves important governmental objectives and is substantially related to those objectives. *Id.*[26] *See also Nicholson v. Georgia Dept. of Human Resources*, 918 F.2d 145, 148 (11th Cir.1990) (right to be free from intentional sex discrimination in the workplace is clearly established); *Goodwin v. Circuit Court of St. Louis County, Mo.*, 729 F.2d 541, 546 (8th Cir.1984) (right to be free of invidious sex discrimination "certainly is clearly established, and no one who does not know about it can be called 'reasonable' in contemplation of law").

Indeed, in *Burrell v. Board of Trustees of Ga. Military College*, 970 F.2d 785 (11th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1814, 123 L.Ed.2d 445 (1993), the Eleventh Circuit held that the "additional safeguard" of the intent requirement in actions proceeding under 42 U.S.C.A. § 1985(3) "obviates the need for granting public officials qualified immunity" at all because "any actions by public officials based on [invidiously discriminatory] animus deserve to be chilled with the full force of federal law." *Id.* at 794. Although *Burrell* need not be extended to conclude that there is similarly no need for qualified immunity under § 1983 when a defendant is charged with intentional discrimination, *Burrell* does support the conclusion that the law is well settled that certain forms of intentional discrimination, including sexual discrimination, are prohibited by the fourteenth amendment.

**24.** For a claim of sexual harassment under Title VII, the ultimate inquiry is not intent, but rather "whether or not the sexual harassment altered the conditions of the victim's employment." *Bohen v. City of East Chicago, Ind.*, 799 F.2d 1180, 1187 (7th Cir.1986). *See also Meritor Savings Bank*, 477 U.S. at 68, 106 S.Ct. at 2406.

**25.** Admittedly, the Eleventh Circuit has held that, "In an action proceeding under both Title VII and § 1983, the substantive elements of proof are the same under both statutes." *Pearson v. Macon-Bibb County Hosp. Auth.*, 952 F.2d 1274, 1281 (11th Cir.1992); *see also Palmer v. District Bd. of Trustees of St. Petersburg Junior College*, 748 F.2d 595, 596 n. 2 (11th Cir.1984). In *Pearson*, the court held that because there were genuine issues of material fact as to the plaintiff's Title VII claim, summary judgment as to plaintiff's § 1983 claim was also necessarily precluded. 952 F.2d at 1281. The court cannot, howev-

er, rely on *Pearson*'s statement that the elements of a Title VII claim and an equal protection claim under § 1983 are coextensive. *Pearson* addressed a claim of racial discrimination in employment, not sexual harassment. As explained above, it appears that, unlike an action for racial or sexual discrimination under Title VII, an action for sexual harassment under Title VII may lie without evidence of intent.

**26.** As the Seventh Circuit wrote in *Bohen*, however, it is

"most unlikely that a defendant can defeat a claim of sexual harassment by showing that the harassment was justified or had a legitimate business purpose. The nature of the harm is such that there is virtually no scenario imaginable where sexual harassment is a necessary business practice or substantially related to important governmental objectives." 799 F.2d at 1187.

The court further concludes that Saville has satisfied the second part of the two-pronged test as to whether Shanks violated clearly established law. She has presented sufficient evidence to create a jury question as to whether Shanks intended to harass her because of her sex. A jury could infer from the evidence that the men with whom Saville worked did not have to suffer the hostile environment and *quid pro quo* harassment that she had to suffer.

In conclusion, no reasonable person in Shanks's position could have concluded in 1991 that the sexual harassment he allegedly engaged in, to the extent it was intentionally directed to Saville because of her sex, was constitutionally permissible under the equal protection clause. The contours of Saville's right to be free from intentional discrimination in the workplace on the basis of her sex were "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039. Shanks is, therefore, not entitled to qualified immunity to the extent Saville charges him with intentionally harassing her because of her sex but is entitled to such immunity to the extent she charges him with sexual harassment in general.

■ The court will now turn to the question of the institutional defendants' liability under § 1983. The institutional defendants argue that they cannot be held liable for Shanks's conduct under § 1983. It is established that a governmental entity may be held liable under § 1983 when the deprivation at issue was undertaken pursuant to governmental "custom" or "policy" and not simply on the basis of *respondeat superior. Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1479 (11th Cir.1991). *See also St. Louis v. Praprotnik*, 485 U.S. 112, 125 n. 2, 108 S.Ct. 915, 925 n. 2, 99 L.Ed.2d 107 (1988); *Pembaur v. Cincinnati*, 475 U.S. 469, 478–80, 106 S.Ct. 1292, 1297–98, 89 L.Ed.2d 452 (1986); *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978). It is undisputed that the institutional defendants are "governmental entities" for purposes of determining § 1983 liability.

■ As the Eleventh Circuit explained in *Brown*, a governmental act is not "limited to decisions made by the [government agency's] official legislative body or in written agreements." 923 F.2d at 1480. Rather, "policy also may be implicated by the acts of individual policymaking officials or by pervasive ... custom." *Id.* The court must reject Saville's argument that she was subjected to a "pervasive custom" of sexual harassment. She has presented no evidence to show that any of the actions taken by Shanks or other employees were pursuant to customs of the institutional defendants. Saville is not, therefore, "able to prove the existence of a widespread practice that, although not authorized by written law or express [municipal] policy, is 'so permanent and well settled as to constitute a custom or usage with the force of law.'" *Praprotnik*, 485 U.S. at 127, 108 S.Ct. at 926. The institutional defendants cannot, therefore, be held liable under the customs prong of § 1983 governmental liability.

■ Governmental liability is also available under § 1983 if the actions in question were taken by a person who is a "final policymaker." A government agency "is responsible for any actions taken by the particular official who 'possesses final authority to establish [governmental] policy with respect to the action ordered.'" *Brown*, 923 F.2d at 1480 (quoting *Pembaur*, 475 U.S. at 481, 106 S.Ct. at 1299). It does not appear to the court that Shanks had "final authority" as to any of his actions as an instructor and supervisor at the Cummins School. Thus, the institutional defendants cannot be held liable for any of his actions under § 1983.

■ The court believes, however, that Gail Holliday, director of the nurse anesthesia school, did have such authority. As the court holds today, there is a material factual dispute as to whether her decision to appoint Shanks to Saville's evaluation team and her requirement that Saville work under his direction contributed to the alleged hostile work environment. It appears that Holliday may have been the final policymaker on these decisions, particularly in light of the fact, by the institutional defendants' own admission, that, in June 1991, Holliday institut-

ed an entirely new evaluation scheme, apparently on her own. The evaluation team to which Shanks was appointed a member was the product of Holliday's new scheme. Should her actions be found to be discriminatory or retaliatory, the institutional defendants could be held liable under § 1983.

Admittedly, because "w]hether a particular official has final policymaking authority is a question of state law," *Brown*, 923 F.2d at 1480, this court must consider the relevant Alabama laws prior to trial. *See id.* at 1480 & 1481 n. 10. At this juncture, however, Saville has presented sufficient circumstantial evidence to warrant denial of the institutional defendants' request for summary judgment on the § 1983 equal protection claim.

### b. *Free Speech*

 Shanks reads Saville's complaint to assert a claim that he violated her free speech rights by retaliating against her because of her complaints of sexual harassment.[27] This claim, without more, does not allege a violation of a clearly established right under § 1983. The United States Constitution does not guarantee public employees absolute freedom of speech; rather, an employee's speech rights must be balanced against the interests of the public employer in regulating the speech of its employees. *Ferrara v. Mills*, 781 F.2d 1508, 1512–13 (11th Cir.1986). In order to determine whether an allegedly retaliatory employment decision violates an employee's free speech rights, the Eleventh Circuit applies a four-part test. *Morgan v. Ford*, 6 F.3d 750, 754 (11th Cir.1993). First, the plaintiff must demonstrate that her speech addressed a "matter of public concern." Whether the speech relates to a matter of public concern is a question of law that the court may appropriately resolve on a motion based on the pleadings. *Ferrara*, 781 F.2d at 1515. If the speech does not, the court's inquiry is at an end. If it does, the court will apply the balancing test to determine whether the state's competing interest in "promoting the efficiency of the public services it performs through its employees" outweighs the employee's interest in commenting on matters of public concern. *Pickering v. Board of Educ. of Township High School Dist. 205*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968). If the plaintiff prevails on the balancing test, the court considers whether the speech was a "substantial and motivating factor" in the employment decision. *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983). Finally, the court must determine if the employer would have made the same decision in the absence of the protected expression. *Morgan*, 6 F.3d at 754.

If Saville intended to raise a free speech claim under § 1983, she has failed to allege, let alone to offer legal support, that the speech at issue addresses matters of public concern rather than simply a personal grievance. Saville has, therefore, not satisfied the initial requirement and there is no need for the court to look further. *Ferrara*, 781 F.2d at 1512. In any case, were she to have made such an allegation, the Eleventh Circuit has held that matters of sexual harassment, although serious, are "centered around [the employee's] private matters, not matters of social interest." *Morgan*, 6 F.3d at 755.[28] Because Saville has not shown the violation of any free speech right as a matter of law, Shanks's request for summary judgment on this claim will be granted. In addition, because no free speech right has been violated, Saville will also not be permitted to proceed with this claim against the institutional defendants.

### c. *Due Process*

 Saville argues that defendants violated her rights to "procedural" due process under the fourteenth amendment, as enforced by § 1983. Defendants do not dispute

---

**27.** Because Saville did not brief this claim, the court is not certain that she intended to raise it. Nevertheless, because Shanks believes the issue has been raised, the court will address the free speech claim.

**28.** *Morgan* does not appear to set forth an absolute rule in sexual harassment cases, and does not address a situation where an employee relates her concerns about sexual harassment to the public or attempts to inform the public. 6 F.3d at 755. There has been no evidence in this case, however, that Saville attempted to make any such connections to the public at large.

for purposes of this request that Saville had a protected property right in her enrollment at the nurse anesthesia school; rather, they assert that the procedures afforded Saville exceeded the minimum procedures required by constitutional due process. Saville responds that the procedures to which she was entitled were those outlined in the student handbook—an established contractual procedure. In essence, she argues that the procedures set forth in the handbook were themselves a protected right under the due process clause.

The court cannot agree with Saville. The cases relied upon by her—to support her proposition that failure to adhere to state laws or regulations specifying the procedures to be used in depriving one of a property interest can give rise to procedural due process claims under federal law—address non-academic settings and can be distinguished.

For example, in one of the cases relied upon by Saville, *Taylor v. Ledbetter*, 818 F.2d 791 (11th Cir.1987), the Eleventh Circuit held that a Georgia statutory foster care scheme which "mandate[d] that officials follow guidelines and take affirmative actions to ensure the well being and promote the welfare of children in foster care" was "more than just 'procedural guidelines' to be followed in arriving at decisions." 818 F.2d at 799. Instead, the scheme created a claim of entitlement in the statutory procedures, with the result that the plaintiff could not be deprived of those procedures without due process. In that case, however, the entitlement involved—the protection of children in foster care—could be equated with the procedures mandated to protect the children, such as foster parent training and personal visits. That is, the procedures themselves defined the entitlement.

Entitlements in the employment and academic contexts, however, can be distinguished. In these contexts, the substance of the entitlement is the job or the education. The procedures set forth by state statute or regulation to be followed when these entitlements are denied are simply "procedural guidelines" and do not define or create the entitlement. The court finds as a general matter, therefore, that cases like *Taylor* are not controlling of the instant situation.

In *Harris v. Birmingham Bd. of Educ.*, 817 F.2d 1525 (11th Cir.1987), the Eleventh Circuit spoke more directly to the issue before the court. In *Harris*, a discharged employee alleged that the failure of his employer to follow procedures mandated by Alabama law for the termination of employees violated his federal due process rights. The Eleventh Circuit did not agree and reasoned that, "Even if the notice in this case is insufficient to satisfy the state statute, the state statute does not define the process due under the federal Constitution," 817 F.2d at 1527–28; rather, "even if the state statute has been violated, that does not prove a violation of a federal constitutional right." *Id.* "Harris must show not just a violation of a state statute," the court continued, "but a constitutional violation in this section 1983 action." *Id.* The court concluded that, "Although the state statutory notice requirement is stated in mandatory language, ... the violation of a state statute outlining procedure does not necessarily equate to a due process violation under the federal constitution." *Id.* at 1527–28 (citations omitted).

Assuming that the student handbook could be characterized as a state statute or regulation, the court finds that it at best sets forth procedural guidelines. Indeed, Saville fails even to allege how any of the provisions in the student handbook create a substantive entitlement worthy of federal due process protection.[29] Because the student handbook provisions are merely procedural and are not a "substantive predicate" within the meaning of *Harris*, the court finds as a matter of law that the handbook in no way enlarges the constitutional due process to which Saville is entitled in the context of an academic dismissal.[30]

---

**29.** Saville, of course, may have valid contract claims that could arise from the alleged violation of the student handbook procedures. Whether Saville has claims under state law is a separate question from her rights under the due process clause.

**30.** The court need not, therefore, consider any of the provisions of the handbook; defendants' re-

The court now turns to the scope of the process due in this context and again assumes that Saville's position in the nurse anesthesia school was a protected interest. The Supreme Court has specifically considered what process is due in the context of an academic dismissal. In *Board of Curators of University of Missouri v. Horowitz*, 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978), the Court noted the "significant difference between the failure of a student to meet academic standards and the violation by a student of valid rules of conduct," and held that "[t]his difference calls for far less stringent procedural requirements in the case of an academic dismissal." *Id.* at 86, 98 S.Ct. at 953. Academic dismissals do not require formal hearings; instead, there need only be a showing that the decisionmaking process was "careful and deliberate." *Id.* at 85, 98 S.Ct. at 952. *See also Haberle v. University of Alabama in Birmingham*, 803 F.2d 1536, 1539 (11th Cir.1986).

Saville does not appear to contest the fact that she received the constitutional minimum of due process as described in *Horowitz* and *Haberle*. The court concludes on its own review of the evidence that the institutional defendants provided Saville with all process, if not more than that, required by the due process clause and that the decision to dismiss her was at least as careful and deliberate as the dismissal of the fourth-year medical student in *Horowitz*. Saville received the benefit of the following procedures: a warning in September 1991; two 30–day clinical probation periods; and, after dismissal, a grievance hearing where she was entitled to select a representative to sit on the committee, was present during the testimony of all witnesses, and was allowed to testify, present her own witnesses, cross-examine other witnesses, and make a closing statement.

Although Saville does not claim a violation of "substantive" due process in her complaint or brief the issue in response to defendants' requests for summary judgment, she appears to state a substantive due process claim in her contentions in the pretrial order. This claim would be rejected as well. The review of academic dismissals under substantive due process is "very narrow." *Haberle*, 803 F.2d at 1539. As the Supreme Court explained in *Regents of University of Michigan v. Ewing*, 474 U.S. 214, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985), courts may not override a "genuinely academic decision ... unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Id.* at 225, 106 S.Ct. at 507. The court concludes that Saville's dismissal was, on its face, within accepted academic norms. Defendants' request for summary judgment on Saville's due process claim—whether procedural or substantive—will therefore be granted.[31]

### 4. *Section 1985(3)*

Saville has brought an action against Shanks alleging a conspiracy with director Holliday and other officials of the institutional defendants to deprive her and other female students of the equal protection of the laws, in violation of 42 U.S.C.A. § 1985(3). The elements of a cause of action under § 1985(3) are:

"(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States."

*Lucero v. Operation Rescue of Birmingham*, 954 F.2d 624, 627 (11th Cir.1992) (quoting *United Brotherhood of Carpenters & Joiners of America, Local 610, AFL–CIO v. Scott*,

quest to strike the handbook from consideration is therefore moot.

**31.** An additional basis for holding that Shanks did not violate Saville's due process rights is that he had no duties or responsibilities regarding the notification, grievance hearing, or appeal procedures provided to her.

463 U.S. 825, 828–29, 103 S.Ct. 3352, 3356, 77 L.Ed.2d 1049 (1983)).

■ In determining if Saville has submitted sufficient evidence to withstand summary judgment on her § 1985(3) claim, the court need not have before it evidence of a "smoking gun" and may consider circumstantial evidence. *Burrell,* 970 F.2d at 789. Saville has submitted sufficient circumstantial evidence to make out a prima facie case of conspiracy. Specifically, she has alleged that she was forced to continue to work with and be evaluated by Shanks after her complaint, that her clinical performance thereafter suffered, and that the institutional defendants followed procedures newly implemented by director Holliday in evaluating and dismissing her. Shanks, Holliday, and other officials of the institutional defendants were involved in each of these acts in furtherance of the alleged conspiracy.

■ Shanks has raised three challenges to Saville's § 1985(3) claim. First, he argues that he is entitled to qualified immunity. Under binding precedent in this circuit, this contention must be rejected. In *Burrell,* the Eleventh Circuit Court of Appeals held that public officials and private individuals "cannot raise a qualified immunity defense to a section 1985(3) claim." 970 F.2d at 793–94, 796. Although *Burrell* involved a claim of a race-based conspiracy, the court in its language did not restrict its holding to the facts of that case. The court wrote that "Unlike in section 1983 actions, public officials ... will not be subject to liability under section 1985(3) unless their actions were motivated by 'some racial, or *perhaps otherwise class-based,* invidiously discriminatory animus.'" *Id.* (quoting *Lucero v. Operation Rescue of Birmingham,* 954 F.2d 624, 627–28 (11th Cir. 1992) (footnote omitted)) (emphasis added). The court acknowledged that § 1985(3) could reach beyond race to "otherwise class-based, invidiously discriminatory animus." *Id.* The court explained that this broad rejection of qualified immunity was appropriate because § 1985(3)'s "narrow intent requirement erects a significant hurdle" to plaintiffs proceeding under that section. *Burrell,* 970

F.2d at 794. The court further explained that "Section 1985(3) actions often stand or fall on the plaintiff's ability to establish the specific type of discriminatory animus behind the conspirators' actions." *Id.* Thus, public officials "enjoy an additional protection against section 1985(3) actions not available to them in section 1983 actions." *Id.* The type of intentional discrimination proscribed by § 1985(3), the court concluded, "has no place in public policy and any actions by public officials based on such animus deserve to be chilled with the full force of federal law." *Id.* Because the law of this circuit is that there is no defense of qualified immunity to an otherwise valid claim of intentional, class-based conspiracy under § 1985(3), Shanks's assertion of this defense must fail.

■ Second, Shanks argues that § 1985(3) claims are actionable against only racially motivated conspiracies. Whether § 1985(3) protects classes of women is a question explicitly left open by the Supreme Court and the Eleventh Circuit Court of Appeals. *Bray v. Alexandria Women's Health Clinic,* —— U.S. ——, ——, 113 S.Ct. 753, 758, 122 L.Ed.2d 34 (1993); *Lucero,* 954 F.2d at 629 & n. 6. This court is of the opinion that § 1985(3) protects women as a class and adopts the reasoning set forth by Judge Kravitch in *Lucero.* There, she concluded that § 1985(3) "is not specifically limited to Blacks, and its goal of protecting groups from those who seek to deprive them of their constitutionally guaranteed rights is equally applicable to women." 954 F.2d at 631 (Kravitch, J., dissenting).[32] Because § 1985(3) protects women, Shanks's argument is without merit.

■ Third, Shanks argues, apparently referring to the intracorporate conspiracy exception, that "[a] corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation." *Nelson Radio & Supply Co. v. Motorola, Inc.,* 200 F.2d 911, 914 (5th Cir.1952), *cert. denied,* 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953). Although *Nelson Radio* applied

---

**32.** The court in *Lucero* held that obstruction of abortion clinics was not tantamount to animus against women and therefore did not reach the question of whether § 1985(3) applied to women.

this intracorporate conspiracy exception to an antitrust case, several courts have applied it in the § 1985(3) context. *See Hull v. Cuyahoga Valley Bd. of Educ.,* 926 F.2d 505, 509 (6th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 2917, 115 L.Ed.2d 1080 (1991); *Travis v. Gary Community Mental Health Center,* 921 F.2d 108 (7th Cir.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 60, 116 L.Ed.2d 36 (1991).

■ The Supreme Court expressly left this issue open in *Great American Fed. Sav. & L. Assn. v. Novotny,* 442 U.S. 366, 372 n. 11, 99 S.Ct. 2345, 2349 n. 11, 60 L.Ed.2d 957 (1979). The Eleventh Circuit has not addressed the question of intracorporate conspiracy in the context of § 1985(3); the court, however, refused to apply the intracorporate conspiracy exception to criminal conspiracy charges and noted with approval that courts have refused to apply the exception in the § 1985 context. *United States v. Hartley,* 678 F.2d 961, 971 (11th Cir.1982) (collecting cases), *cert. denied,* 459 U.S. 1170, 103 S.Ct. 815, 74 L.Ed.2d 1014, *and cert. denied,* 459 U.S. 1183, 103 S.Ct. 834, 74 L.Ed.2d 1027 (1983). In rejecting the intracorporate exception, the First Circuit Court of Appeals wrote that, "The cases employing it have rested in large part on precedent drawn from the antitrust field, where considerations underlying the need for an 'intracorporate' exception to ordinary conspiracy principles are very different." *Stathos v. Bowden,* 728 F.2d 15, 20–21 (1st Cir.1984). The court continued that, "The evil at which the 'conspiracy' section of the Sherman Act, 15 U.S.C. § 1, is aimed is an evil that exists only when two different business *enterprises join* to make a decision, such as fixing a price, that in a competitive world each would take separately," *id.* at 21 (emphasis in original); "an individual decision to do the same thing is not only legitimately socially useful but also may often require joint decision-making by managers within a single enterprise." *Id.* The court then contrasted this observation with the observation that, "Where "equal protection" is at issue ... one cannot readily distinguish in terms of harm between the individual conduct of one enterprise and the joint conduct of several," *id.,* and that "Nor can one readily identify desirable social conduct as typically engaged in jointly by the officers of a single enterprise." *Id.* The court then concluded that, "the boundaries of an "intracorporate" exception to the § 1985(3) conspiracy provision should be narrower than in antitrust," *id.,* and that, "Indeed, we do not see why they should extend—if at all—beyond the ministerial acts of several executives needed to carry out a single discretionary decision." *Id.* Surely, members of the Ku Klux Klan could not avoid the strictures of § 1985(3) simply by incorporating themselves. This court is of the opinion that the intracorporate conspiracy exception is not available in this circuit to a defendant in a § 1985(3) action.[33]

Because Shanks is not entitled to qualified immunity, because § 1985(3) protects women, and because the conspiracy alleged against Shanks and others is not subject to the intracorporate conspiracy exception,

---

**33.** Nevertheless, even if the intracorporate conspiracy exception were available under § 1985(3), defendants would still not be entitled to its summary application. Courts that have applied the exception to § 1985(3) have indicated that a conspiracy claim may still be asserted against employees of a corporation when those employees have an independent "personal stake" in the discrimination. *See Girard v. 94th Street & Fifth Avenue Corp.,* 530 F.2d 66, 70–72 (2d Cir.), *cert. denied,* 425 U.S. 974, 96 S.Ct. 2173, 48 L.Ed.2d 798 (1976); *Coley v. M & M Mars, Inc.,* 461 F.Supp. 1073, 1076 (M.D.Ga.1978). In *Coley,* the court explained the "personal stake" exception to the intracorporate conspiracy exception as follows:

"[A]llegations of continual discriminatory harassment at the hands of individual employ-

ees are sufficient to survive dismissal because, in the backdrop of racial discrimination, such allegations express the likelihood that these employees were motivated by a personal racial bias and were not acting out of concern for the best interests of their employer."

461 F.Supp. at 1076.

The court concludes that, as a matter of law, the conspiracy alleged against Shanks and other employees of the institutional defendants involved, at least in part, personal motivation. If Saville proves her allegations at trial, the discriminatory acts against her cannot be said to have been a single act of the institutional defendants, nor can they be said to have been taken for the collective purpose of the institutional defendants.

Shanks's request for summary judgment on this claim will be denied.

### 5. State–Law Claims

#### a. Invasion of Privacy

■■ Saville has raised a claim of invasion of privacy against both Shanks and the institutional defendants. Because the institutional defendants are liable, if at all, only upon a showing of Shanks's liability, the court will first address Shanks's request for summary judgment on this claim.[34]

The Alabama Supreme Court has defined invasion of privacy as "the wrongful intrusion into one's private activities in such a manner as either to outrage a person of ordinary sensibilities or to cause such a person mental suffering, shame or humiliation." *Grimsley v. Guccione*, 703 F.Supp. 903, 909 (M.D.Ala. 1988). *See also Phillips v. Smalley Maintenance Services*, 435 So.2d 705, 708 (Ala.1983). Actionable under the "wrongful intrusion" prong is the "intentional interference with another's interest in solitude or seclusion, either as to his person or to his private affairs or concerns." *Busby v. Truswal Systems Corp.*, 551 So.2d 322, 323 (Ala.1989) (quoting W. Prosser & W. Keeton, *The Law of Torts*, at 851 (5th ed. 1984)). In *Phillips*, the Alabama Supreme Court answered a certified question from the Eleventh Circuit in a case in which the defendant "struck [the plaintiff] across the buttocks with his hand," among other physical and verbal conduct; the court indicated that it had "no hesitancy" in concluding that such conduct constituted the tort of invasion of privacy. 435 So.2d at 711. On the authority of *Phillips*, this court concludes that Shanks's alleged conduct toward Saville presents a jury question on the invasion of privacy claim. Shanks's request for summary judgment on this claim, therefore, will be denied.

■■ The institutional defendants can only be found liable for Shanks's alleged tort if Saville shows that his wrongful acts were in the line and scope of his employment, that the acts were in furtherance of the business of the employer, or that the employer participated in, authorized, or ratified the wrongful acts. *Joyner v. AAA Cooper Transportation*, 477 So.2d 364, 365 (Ala.1985). Here, as in *Joyner*, there is no evidence to indicate that Shanks's alleged harassment of Saville was within the line and scope of his employment or in furtherance of the institutional defendants' business. *See also Busby*, 551 So.2d at 327 (defendant's "conduct was aimed purely at satisfying his own lustful desires; no corporate purpose could conceivably be served by his overtures"). The question for the court, therefore, is whether the institutional defendants can be said to have participated in, authorized, or ratified Shanks's conduct.

The Alabama Supreme Court has held that in order for a plaintiff to show that an employer ratified an employee's conduct, she must show that the employer:

"(1) had actual knowledge of the tortious conduct of the offending employee and that the tortious conduct was directed at and visited upon the complaining employee; (2) that based upon this knowledge, the employer knew, or should have known, that such conduct constituted sexual harassment and/or a continuing tort; and (3) that the employer failed to take 'adequate' steps to remedy the situation."

*Potts v. BE & K Const. Co.*, 604 So.2d 398, 400 (Ala.1992). The first two factors are not in dispute because the institutional defendants had knowledge of at least the June 7 incident which, as alleged, constituted sexually harassing conduct.

As to the third factor, the institutional defendants argue that they took adequate steps to halt Shanks's conduct because Shanks was counseled after the June 7 incident and because the harassing behavior then stopped. The court cannot agree. Although it is undisputed that Shanks did not touch Saville or make any lewd comments directly to her subsequent to his being reprimanded, it is a disputed issue of fact, as decided by the court today, whether the sexual harassment of Saville continued after this

---

**34.** Because the complaint does not state how the institutional defendants invaded Saville's privacy on their own, the court will treat Saville's invasion of privacy claim against them as one arising under a theory of *respondeat superior*.

time in the form of a hostile work environment. Because sexual harassment may constitute invasion of privacy under *Phillips* and because it remains disputed whether the harassment ceased after the institutional defendants' counseled Shanks, the court is unable to conclude that the tortious conduct did not continue.

The court cannot conclude as a matter of law, therefore, that the institutional defendants took adequate steps to halt the harassing conduct. The *Joyner* case relied upon by the institutional defendants is not dispositive because of the court's conclusion that the continuance of the tortious conduct after Shanks's reprimand is in genuine dispute. In discussing *Joyner*, the Alabama Supreme Court explained:

"We agree with the proposition that if the undisputed evidence shows that the employer, as soon as it was practical to do so after learning of the conduct, took steps to stop the tortious conduct and *the tortious conduct stopped*, the steps taken by the employer were adequate as a matter of law.

"Conversely, evidence that an employer, after learning of the tortious conduct, failed to stop the tortious conduct of the offending employee presents a question of fact, unique under the circumstances of each case, as to whether the steps taken to stop the conduct were adequate."

*Potts*, 604 So.2d at 401 (emphasis in original). The court found that questions such as "the severity of the disciplinary action as compared to the seriousness of the conduct," and whether the employer sufficiently monitored the employee after disciplining him were questions for the jury. *Id.* The institutional defendants' request for summary judgment on the invasion of privacy claim will therefore be denied.

#### b. *Outrageous Conduct*

▉▉▉ Saville has raised a claim of outrageous conduct against both Shanks and the institutional defendants and both have moved for summary judgment on this claim. The tort of outrage under Alabama law is defined in *American Road Serv. Co. v. Inmon*, 394 So.2d 361, 365 (Ala.1980). To be liable for this tort, a person must "by extreme and outrageous conduct intentionally or recklessly cause[ ] severe emotional distress to another." *Id.* Specifically, the court explained:

"The emotional distress ... must be so severe that no reasonable person could be expected to endure it. Any recovery must be reasonable and justified under the circumstances, liability ensuing only when the conduct is extreme.... By extreme we refer to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society."

*Id.* The Alabama Supreme Court "has applied the stringent *Inmon* test rather strictly, to hold in a number of cases that the alleged conduct did not present a jury question on the tort of outrage." *Continental Cas. Ins. Co. v. McDonald*, 567 So.2d 1208, 1211 (Ala.1990) (collecting cases).

This court concludes that, as a matter of law, the conduct of neither Shanks nor the institutional defendants was sufficiently extreme to make out a claim of outrageous conduct—even assuming that the allegations of Saville are proved to be true. To make out a claim for outrageous conduct, both the conduct and the emotional distress must be extreme. Saville's evidence does not meet this test as applied by the Alabama Supreme Court. The court has made clear that the tort of outrage "is a limited remedy to be applied only in egregious circumstances." *Busby*, 551 So.2d at 328. Saville cites no case—nor has the court found one upon independent review—in which the Alabama Supreme Court has held the type of sexual harassment alleged in this case to constitute outrageous conduct. In contrast, the court has held "that several requests by an employer for a female employee to have dinner with him, to kiss him, or to have an affair with him would not support a claim for outrageous conduct." *Busby*, 551 So.2d at 327–28 (discussing *McIsaac v. WZEW–FM Corp.*, 495 So.2d 649 (Ala.1986)). Shanks's and the institutional defendants' request for summary judgment on the outrageous conduct claim will therefore be granted.

### c. Assault and Battery

■ Saville has raised a claim of assault and battery against both Shanks and the institutional defendants. Because the institutional defendants are liable, if at all, only upon a showing of Shanks's liability, the court will first turn to Shanks's request for summary judgment on this claim.[35] Assault and battery under Alabama law consists of the touching of the person of another in rudeness or anger. *Allen v. Walker*, 569 So.2d 350, 351 (Ala.1990); *Surrency v. Harbison*, 489 So.2d 1097, 1104 (Ala.1986). The Alabama Supreme Court has explained:

"A successful assault becomes a battery. A battery consists in an injury actually done to the person of another in an angry or revengeful or rude or insolent manner, as by ... in any way touching him in anger.... *[T]he question of bodily pain is important only as affecting the damages.*"

*Surrency*, 489 So.2d at 1104 (quoting Cooley on Torts) (emphasis added in original).

■ Under Alabama law, "when there is conflicting evidence, as here, the issue of whether there was, in fact, an assault and battery at all is a question for the jury." *Id.* There is a genuine dispute as to whether Shanks touched Saville in anger when he allegedly grabbed her buttocks—particularly in the context of the previous harassing statements Saville charges he made to her— or whether he did so in a joking and teasing manner as he claims. There is also a genuine dispute as to whether Shanks's alleged statements were intended to "create a reasonable or well-founded apprehension of imminent harm" in Saville so as to constitute assault. *Allen*, 569 So.2d at 352. Shanks's summary judgment request on the assault and battery claim will therefore be denied.

■ Under the *Potts* standard for an employer's liability for the torts of its employees, however, the institutional defendants' request will be granted. An employer is not liable if "the steps taken to stop the conduct were adequate." *Potts*, 604 So.2d at 401. Here, it is undisputed by the parties that, after Shanks was counseled by the institutional defendants, he made no further lewd comments and did not touch Saville again. Saville admits that Shanks was a "perfect gentleman" after he was counseled by his supervisor.[36] Because "the tortious conduct stopped," the steps taken by the institutional defendants were adequate as a matter of law. *Id.* Without ratifying Shanks's conduct, the institutional defendants cannot be held liable.[37]

To conclude, both Shanks's and the institutional defendants' requests for summary judgment on the invasion of privacy claim will be denied; both requests will be granted on the outrageous conduct claim; and Shanks's request will be denied on the assault and battery claim, while the institutional defendants' request will be granted.

### 6. Service of Process

Shanks argues that this court lacks jurisdiction over him because he was not properly served. It is true that, when Saville initially caused her complaint to be served, she served Shanks at the Cummins School, and a Cummins School representative accepted service of process for Shanks without his authority. Shanks now admits, however, that service of process has been perfected on him.[38] The court will not, therefore, dismiss this action on service-of-process grounds.

### B. The Institutional Defendants' Motions to Strike

■ The institutional defendants have filed motions to strike from consideration

---

**35.** Because the complaint does not state how the institutional defendants assaulted or battered Saville, the court will treat Saville's assault and battery claim against them as one arising under a theory of *respondeat superior*.

**36.** Saville Depo., at 142–43.

**37.** This conclusion is not inconsistent with the court's denial of the institutional defendants' request for summary judgment on the invasion of privacy claim because under that claim it is disputed whether the invasion of privacy tort— sexual harassment—continued after Shanks was counseled. Under the assault and battery claim, in contrast, it is undisputed that the alleged assault and battery incidents did not continue after Shanks was counseled by the institutional defendants.

**38.** Shanks Depo., at 56–57.

certain of Saville's evidentiary submissions. First, the institutional defendants urge the court to strike ¶¶ 30 and 33 of Saville's affidavit wherein she represents that she received satisfactory clinical evaluations prior to June 7, 1991. Second, the institutional defendants seek to have the court strike certain documentary evidence, including faculty minutes and a student handbook, because these items were not authenticated. Because the court has not relied on any of the statements or documents challenged by the institutional defendants, the motions to strike will be denied as moot.

## C. *Saville's Motion to Amend*

 Saville moves the court for leave to amend her complaint to add a breach of contract claim based on the institutional defendants' alleged failure to adhere to certain provisions of the student handbook. Amendments to pleadings were to have been filed by September 29, 1993. After the period for amendment of a complaint has passed, "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Fed.R.Civ.P. 15(a); *Stevens v. Gay,* 864 F.2d 113, 116 (11th Cir.1989).

The institutional defendants argue that the motion to amend should be denied because Saville never asserted a claim for breach of contract, even though she had the student handbook in her possession from the time she enrolled in the nurse anesthesia school. The institutional defendants further argue that they will be prejudiced because they have not conducted discovery on basic issues of contract such as formation and reliance.

The court does not agree. Saville's due process claim, for which discovery has already been completed, is similar to her breach of contract claim, and it appears to the court that both claims would require similar evidence. Furthermore, Saville asserted a breach of contract claim as part of her contentions in the pretrial order. In any event, if additional discovery is required, the court will allow discovery on issues relating to the contract claim only; the institutional defendants need only make such a request to the court. The motion for leave to amend the complaint to add a breach-of-contract claim will be granted.

Accordingly, for the reasons set forth above, it is ORDERED:

(1) That the motion for summary judgment, filed by defendants Houston County Healthcare Authority and Southeast Alabama Medical Center on November 18, 1993, is granted on the free speech and due process claims under 42 U.S.C.A. § 1983, and on the state-law claims of outrageous conduct and assault and battery, and that the motion is denied in all other respects;

(2) That the motion for summary judgment, filed by defendant Michael Shanks on November 18, 1993, is granted on the claims against him in his individual capacity under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. §§ 2000e through 2000e–17, as amended by the Civil Rights Act of 1991, 42 U.S.C.A. § 1981a, on the free speech and due process claims under 42 U.S.C.A. § 1983, on the equal protection claim under 42 U.S.C.A. § 1983 to the extent he is charged with sexual harassment without the element of intent, and on the state-law claim of outrageous conduct, and that the motion is denied in all other respects;

(3) That the motions to strike certain evidentiary submissions, filed by defendants Houston County Healthcare Authority and Southeast Alabama Medical Center on December 22, 1993, and January 11, 1994, are denied as moot; and

(4) That the motion for leave to amend the complaint to add a breach of contract claim, filed by plaintiff Della Denise Pittman Saville on December 28, 1993, is granted.