803 F.2d 1536
 35 Ed. Law Rep. 662
 Frederick J. HABERLE, Plaintiff-Appellant,
v.
The UNIVERSITY OF ALABAMA IN BIRMINGHAM; Larry K. Krannich,
ind. and in his capacity as an employee of U.A.B.; Fred M.
Sudduth, ind. and in his capacity as an employee of U.A.B.;
Gabriel A. Elgavish, ind. and in his capacity as an employee
of U.A.B.; Kenneth J. Roozen, ind. and in his capacity as
an employee of U.A.B.; Jerry D. Glickson, ind. and in his
capacity as an employee of U.A.B.; Danny Bearce, ind. and
in his capacity as an employee of U.A.B.; Joe Gauthier,
ind. and in his capacity as an employee of U.A.B.; Anthony
Bernard, ind. and in his capacity as an employee of U.A.B.;
Blaine Brownell, ind. and in his capacity as an employee of
U.A.B.; Peter O'Neil, ind. and in his capacity as an
employee of U.A.B. and Charles L. Watkins, ind. and in his
capacity as an employee of U.A.B., Defendants-Appellees.
 No. 86-7109.
 United States Court of Appeals,
Eleventh Circuit.
 Nov. 12, 1986.
 
 David Cromwell Johnson, Leila Hirayama, Birmingham, Ala., for Frederick J. Haberle.
 Ina B. Leonard and Charles H. Self, Jr., Office of the University Counsel, University of Alabama at Birmingham, Birmingham, Ala., for The University of Alabama in Birmingham.
 Appeal from the United States District Court for the Northern District of Alabama.
 CORRECTED OPINION
 Before HILL and HATCHETT, Circuit Judges and THOMAS*, Senior District Judge.
 HILL, Circuit Judge:
 
 FACTS
 
 1
 Appellant Frederick J. Haberle was admitted to graduate school at the University of Alabama at Birmingham in July, 1979, to pursue a Ph.D. in chemistry. The requirements to obtain that degree are set out in a document entitled "Requirements for Degree in Chemistry." Generally it shows that the requirements for a Ph.D. in chemistry are completion of course work, demonstration of competence in two foreign languages, successful completion of the qualifying examination, presentations at two seminars, and the completion of a dissertation. Mr. Haberle was given a copy of this document soon after he entered the program. During his time as a student in the chemistry department, Haberle completed his course work, demonstrated his competency in two foreign languages, and made a presentation at one graduate seminar.
 
 
 2
 Mr. Haberle completed his course work in the fall of 1981. He registered for his dissertation in research in the winter term of 1980-81 and continued with it through the summer term of 1983-84. In July of 1981, the graduate committee supervising Mr. Haberle's studies met to discuss his curriculum and the qualifying (or "comprehensive") examination requirement. At this meeting the committee listed remaining course requirements, and planned to meet again in order to consider a research proposal and set a date for the qualifying examination. However, the committee did not meet again until January of 1984. At that time the committee noted that Haberle had never taken the qualifying examinations, and suggested he do so promptly. Mr. Haberle objected, stating that he should have taken the exam before beginning his dissertation research three years prior. However, the committee insisted that he take the qualifying exam.
 
 
 3
 The exam is divided into two portions, a written portion and an oral portion. Mr. Haberle passed the written portion by one point, and failed the oral portion. He was given the choice between accepting a master's degree or retaking the qualifying examination. He chose to take the exam again, and he failed again. He was then dismissed from the Chemistry Ph.D program.
 
 
 4
 After his dismissal Mr. Haberle complained to Dr. Blaine Brownell, who was then co-dean of the graduate school. He was advised to ask the committee members to reconsider their decision. They refused to do so. Mr. Haberle then addressed a grievance to the two deans of the graduate school, Kenneth J. Roozen and Blaine Brownell, and Peter O'Neal, Dean of the School of Natural Sciences and Mathematics.
 
 
 5
 O'Neal, along with the dean of the graduate school, decided that O'Neal would appoint an impartial committee to review Mr. Haberle's grievance. O'Neal appointed Professors Joseph Gauthier and Daniel Bearce to review the matter. They had never had any dealings with Mr. Haberle. Haberle was given the opportunity to submit additional information to the committee; he declined the opportunity to do so. The reviewing committee decided that the graduate committee had acted reasonably and that Mr. Haberle had been treated fairly. Their decision was then reviewed by the dean of the graduate school, who concurred.
 
 
 6
 Soon after, Mr. Haberle filed suit in federal district court, claiming that his dismissal and the procedures used to procure it violated his substantive and procedural due process rights. Haberle objected to the procedure used in disposing of his grievance on the following grounds: (1) the procedures were established on an ad hoc basis, (2) nowhere along the line did any of the administrators review Mr. Haberle's grades, and (3) the procedures did not follow those described in the graduate school bulletin. He also argued that his dismissal was arbitrary and thus a violation of substantive due process.
 
 
 7
 On summary judgment motion, the district court found that, as a matter of law in the Eleventh Circuit, the right to pursue a degree in the public school system was a constitutionally protectable interest, citing Debra P. v. Turlington, 644 F.2d 397 (5th Cir.1981), reh'g denied, 654 F.2d 1079 (5th Cir.1981). The court then dismissed the procedural due process claims, finding that all the procedures used were constitutionally adequate. After the Supreme Court's decision in Regents of the University of Michigan v. Ewing, --- U.S. ----, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985), the district court sua sponte reconsidered its motion for summary judgment and dismissed the substantive due process claims as well.[1]
 
 I.
 
 8
 With respect to the procedural due process claim, the legal standard governing academic dismissals was enunciated in the Supreme Court's decision Board of Curators, University of Missouri v. Horowitz, 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978). The court emphasized that academic dismissals were not easily adapted to traditional review, and that the standards governing academic dismissals were not as strict as those required in disciplinary actions. Formal hearings are not required in academic dismissals. Rather, the Supreme Court held that the decision-making process need only be "careful and deliberate." Horowitz, 435 U.S. at 85-87, 98 S.Ct. at 952-53 (1978).
 
 
 9
 The district court found that under the Horowitz standard, the procedures used in dismissing Mr. Haberle were adequate. The court noted:
 
 
 10
 1. Plaintiff had several discussions with members of the graduate committee during which he expressed objections to taking the preliminary exam.
 
 
 11
 2. He was given two opportunities to take the exam.
 
 
 12
 3. He had discussions with the co-dean of the graduate school, further consideration by the graduate committee, and further consideration by the Dean of the School of Natural Sciences and Mathematics.
 
 
 13
 4. An impartial committee was appointed to review his complaint, and he was given an opportunity to submit further information to the committee.
 
 
 14
 Obviously Mr. Haberle was given substantial opportunity to complain to all relevant decision-makers. The fact that the procedures used were ad hoc does not violate the Horowitz standard; no formal hearing is required. In fact, University officials testified that the procedures afforded Haberle far exceeded the grievance procedure outlined in the University bulletin. There is no reason to reverse the district court's finding that procedural due process requirements were met in this case.
 
 II.
 
 15
 We now turn to the substantive due process issue. In Ewing, --- U.S. ----, 106 S.Ct. 507, 88 L.Ed.2d 523, the Supreme Court laid out a very narrow standard of substantive review over academic decisions. The Supreme Court stated:
 
 
 16
 When judges are asked to review the substance of a genuinely academic decision, such as this one, they should show great respect for the faculty's professional judgment. Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.
 
 
 17
 Id. at 513. [Emphasis added]
 
 The Court continued:
 
 18
 ... Added to our concern for lack of standards is a reluctance to trench on the prerogatives of state and local educational institutions and our responsibility to safeguard their academic freedom, "a special concern of the First Amendment." Keyishian v. Board of Regents, 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967). If a "federal court is not the appropriate forum in which to review the multitude of personal decisions that are made daily by public agencies," Bishop v. Wood, 426 U.S. at 349, 96 S.Ct., at 2079, far less is it suited to evaluate the substance of the multitude of academic decisions that are made daily by faculty members of public educational institutions--decisions that require "an expert evaluation of cumulative information and [are] not readily adapted to the procedural tools of judicial or administrative decision-making." Board of Curators, University of Missouri v. Horowitz, 435 U.S. at 89-90, 98 S.Ct. at 954-55.
 
 
 19
 Id. at 514. Ewing makes it plain that, in the absence of an improper motive, an academic dismissal must be "such a substantial departure from accepted academic norms as to demonstrate that the faculty did not exercise professional judgment," before it will be overturned on substantive due process grounds. Id. at 513.
 
 
 20
 Appellant contends that Mr. Haberle's dismissal was arbitrary because he was required to take the qualifying exam "for no reason." Theoretically the qualifying exam is given to a student before embarking upon dissertation research, to test one's competency and ability to carry out extensive research in one's chosen specialty. Mr. Haberle felt that his three years of dissertation research had already demonstrated his capacity to do extensive research, and that the examination was therefore a totally arbitrary, unnecessary intrusion into his academic career. However, the professors at the Department of Chemistry all felt, as a matter of professional judgment, that such an exam is necessary to test the caliber of one who would enter the company of scholars.
 
 
 21
 A summary chart submitted to the district court proved that no student had ever been awarded a Ph.D without having to take the qualifying exam. In fact, the same evidence proved that it was not at all out of the ordinary for a student to take his or her qualifying exam after registering to begin dissertation research. The court found that requiring Mr. Haberle to take it four years after the normal time (i.e. before beginning one's dissertation research) was not such a substantial departure from academic norms as to amount to an arbitrary deprivation of property.
 
 
 22
 Appellant objects to the admission of the summary chart, noting that a similar chart was excluded in Ewing. However, in Ewing it was used to show that the dismissed individual's academic performance was as bad as other students who had also been dismissed. In the instant case, the chart did not attempt to prove that these students were similarly situated; rather, it merely indicated that the exam had never been waived, and that other students had been required to take it late in their academic career. In other words, the chart was used to demonstrate the academic norms of the Chemistry Department of the University of Alabama, and was therefore admissible.
 
 
 23
 Mr. Haberle also argues that the graduate committee "waived" the exam requirement for him by not requiring that he take the exam before beginning his dissertation research. This argument is purely fallacious. While it may have been unfortunate for the committee to allow him to do three year's worth of dissertation research, in fact no one ever told Mr. Haberle that the exam had been waived, and the exam has never been waived for anyone.[2]
 
 
 24
 Appellant's attempts to distinguish himself from the plaintiff in Ewing do not help him. It is true that in Ewing the student was dismissed because of a generally poor academic performance. His failure to pass his medical boards was merely the crowning blow. In the instant case, Mr. Haberle's performance in the classroom was very good. However, as appellee points out, the qualifying exam is used to probe one's in-depth knowledge of one's chosen specialty. Only one of the five faculty members who examined Haberle felt that he possessed the overall knowledge of the subject and academic talent necessary for advanced graduate study. Professor Larry K. Krannich, Chairman of the Department of Chemistry, testified in his deposition that, while it is routine to allow a student who fails a qualifying exam a second opportunity to pass, no student has ever been given a third opportunity to take the exam. After two attempts Mr. Haberle was dismissed in accordance with the department's normal procedure.
 
 
 25
 It may be unfortunate to spend years studying a discipline only to discover that one's capabilities do not pass academic muster. However, the academic community requires a general comprehensive examination to determine whether or not a student is properly qualified for doctoral accomplishments. Had Mr. Haberle learned earlier that he did not have the comprehensive qualifications in chemistry to make him a suitable candidate for a doctoral degree, he might not have pursued the narrow research studies leading towards his dissertation for quite so long. Nevertheless, this is an academic question. The comprehensive exam is a prerequisite to the doctorate. Mr. Haberle failed the exam. There is no dispute about that. Therefore, he is not entitled to continue to pursue the doctorate. There is nothing arbitrary about such a requirement. The courts should not interfere with this academic decision.[3]
 
 
 26
 Accordingly, the decision of the district court is
 
 
 27
 AFFIRMED.
 
 
 
 *
 Honorable Daniel H. Thomas, Senior U.S. District Judge for the Southern District of Alabama, sitting by designation
 
 
 [1]
 In Ewing the Supreme Court assumed the existence of a protectable property right, though it did not decide the issue because it held that no arbitrary deprivation of the assumed property interest had taken place. Here, the district court found that a protectable property interest was at stake, based on its reading of Turlington. This court will follow the Supreme Court's lead. We assume a property interest, and do not decide the property issue now. However, we do note that Turlington involved a high school student. Attendance in high school is mandatory. Graduate study is voluntary
 
 
 [2]
 Mr. Haberle's waiver claim is also based on his assertion that he raised the question of when he should take his qualifying exam on at least three occasions with his faculty advisor, Dr. Jerry Gilckson. According to Haberle, Gilckson said something to the effect of "Don't worry about that, just do your research." Haberle never consulted any other committee member. This does not render the University officials' actions arbitrary under the Ewing standard. If Haberle wishes to pursue the waiver issue, he should do so in state court along with his other state claims, which were dismissed without prejudice
 
 
 [3]
 Because we decide this case on the merits, we need not address the appellees' concerns with regard to their official immunity under Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)