[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-10221

_____

Agency No. 10988-18

LORI D. SLEETH,

Petitioner-Appellant,

versus

COMMISSIONER OF INTERNAL REVENUE,

Respondent-Appellee.

_____

Petition for Review of a Decision of the
United States Tax Court

_____

(March 19, 2021)

Before GRANT, TJOFLAT, and ED CARNES, Circuit Judges.

GRANT, Circuit Judge:

Lori and David Sleeth filed joint tax returns for the 2008, 2009, and 2010 tax years—but never paid the corresponding tax liabilities. Lori asked the tax court to sever her liability for those unpaid taxes because she was an "innocent spouse."

The tax court denied her request, and she now asks that we reverse. But because the tax court did not abuse its discretion, we affirm.

I.

In 1988, Lori and David Sleeth married.[1] They first settled in Dallas, Texas, where David was working as a lawyer. But after spending several years in the law, David decided to shake things up. As he put it, he "always wanted to be a doctor," and so in 1993 he decided to attend medical school, despite Lori's skepticism.

By 2004, David had finished medical school and his residency program. He and Lori moved to Guntersville, Alabama, and David got a job working for a local hospital system. That new job meant new wealth—David's income "went up dramatically." With it, they bought a "very large home" together in downtown Guntersville that they call "the big house." But the big house wasn't their only big purchase. They also bought a townhouse beside Lake Guntersville, which David gave to Lori. It wasn't long before she began staying there most of the time, away from David who was "working nights and sleeping days." The couple also made other purchases around this time, including a Mercedes, a boat, and even a Cessna airplane—all of which were put in Lori's name.

But more income also meant more taxes. And that's when the trouble began. When their 2005 joint tax return came due, Lori and David could not pay the taxes owed. David was forced to set up an installment agreement with the IRS, which was intended to allow for payment of the couple's 2005 tax liability over time. Little changed in 2006. When the time came to file that return, David and

_____

[1] For clarity's sake, we refer to Lori Sleeth as "Lori" and David Sleeth as "David."

Lori weren't able to pay those taxes either; David asked their accountant to request an extension. That request flagged an outstanding balance on the Sleeths' 2005 return, which canceled their installment agreement. A similar pattern repeated itself in 2007. Once again, the Sleeths were unable to pay the taxes owed, and needed another extension.

Things only went downhill from there. Their 2008, 2009, and 2010 tax returns all showed substantial unpaid tax liabilities. And two of those three returns were filed late. In fact, they weren't filed until 2011, when the Sleeths sent them in along with their 2010 return. By that time, their 2008 return showed about $116,000 due, excluding interest and penalties. And the balances on their 2009 and 2010 returns were around $115,000 and $132,000, respectively. Altogether, the Sleeths owed over $363,000 in taxes at the time of filing. Even that number excluded interest and penalties, but they still made no payments.

The Sleeths were having other issues as well. For starters, the big house and their Cessna airplane were both repossessed. They also lost their boat—it was destroyed in a marina-wide fire around 2015. And more significantly, Lori eventually divorced David. Under their divorce agreement, Lori kept the townhouse, but David was responsible for paying the "remaining mortgage indebtedness" on it. David was also ordered to give Lori $51,000 from his retirement accounts plus another $10,000 in spousal support. Additionally, David accepted full responsibility for their outstanding tax liabilities, and agreed to support Lori's claim for innocent spouse relief—which, if granted, would render David solely liable for their unpaid taxes.

3

Lori requested innocent spouse relief from the IRS for the Sleeths' 2008, 2009, and 2010 tax liabilities. She said that she had "no idea" that payments weren't being made toward their tax liabilities when she signed the returns. But after considering her request, the Commissioner of Internal Revenue denied it. The Commissioner reasoned that Lori "didn't have a reasonable expectation that [David] would or could pay the tax" at the time she signed the returns, and that she had not shown that she would experience economic hardship absent relief. Lori then petitioned the tax court for review, arguing that she was entitled to innocent spouse relief. David intervened in support of her claim, as the divorce agreement required him to. The tax court held a trial before ultimately denying Lori's request. She now appeals.

## II.

We review the tax court's decision denying equitable relief for abuse of discretion, but review underlying questions of law de novo and factual findings for clear error.[2] *See Comm'r v. Neal*, 557 F.3d 1262, 1269 (11th Cir. 2009). At all times, the taxpayer "has the burden of demonstrating that relief should be granted." *Id.* at 1277. An abuse of discretion occurs when a court "applies an incorrect legal standard, relies on clearly erroneous factual findings, or commits a clear error of judgment." *United States v. $70,670.00 in U.S. Currency*, 929 F.3d 1293, 1300

---

[2] Lori suggests in passing that the Taxpayer First Act "might require a revision to the standard of appellate review" for § 6015(f) cases. *See* Pub. L. No. 116-25, 133 Stat. 981 (2019). But because she does not argue that point here, we do not consider it. *See Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("A passing reference to an issue in a brief is not enough, and the failure to make arguments and cite authorities in support of an issue waives it.").

(11th Cir. 2019).  This standard implies a "range of choices" and "often we will affirm even though we would have decided the other way if it had been our choice."  *Gray ex rel. Alexander v. Bostic*, 613 F.3d 1035, 1039 (11th Cir. 2010).

### III.

For married couples, there are upsides to filing joint returns.  To name one, they often get a lower tax rate than if they filed separately.  *See Kistner v. Comm'r*, 18 F.3d 1521, 1524 (11th Cir. 1994).  But there can also be downsides.  Since 1938, the Internal Revenue Code has imposed "joint and several" liability on married couples who file joint returns.  *See* 26 U.S.C. § 6013(d)(3); *Neal*, 557 F.3d at 1264.  This means that each spouse can be held liable for the entire amount of any unpaid tax liability regardless of their level of responsibility.  *Cf. Honeycutt v. United States*, 137 S. Ct. 1626, 1631 (2017).

But that rule has its limits.  Indeed, the Code provides "innocent spouses" three avenues of relief from joint and several liability.  Two deal exclusively with tax understatements.  *See* 26 U.S.C. § 6015(b), (c).  The third, § 6015(f), applies more broadly—but only if the other two are unavailable.  *Id.* § 6015(f)(1)(B).  Section 6015(f) provides that an "innocent spouse" may be relieved of liability for "any unpaid tax or any deficiency" if—after certain threshold conditions are met— it would be "inequitable" to hold the spouse liable given "all the facts and circumstances."  *Id.* § 6015(f)(1)(A).

Under § 6015(f), the Commissioner has authority to prescribe procedures for determining whether a spouse qualifies for this sort of equitable relief.  *Id.* § 6015(f)(1).  And the Commissioner has exercised that authority.  In Revenue

5

Procedure 2013-34, the Commissioner identified a "nonexclusive list" of seven factors to consider in deciding whether to grant equitable relief. Rev. Proc. 2013-34 § 1.01, 2013-43 I.R.B. 397, 397. Those factors include whether (1) the requesting spouse is no longer married to the non-requesting spouse; (2) the requesting spouse would suffer economic hardship without relief; (3) the requesting spouse knew or had reason to know of the underpayment; (4) either spouse has a legal obligation to pay the tax liability; (5) the requesting spouse "significantly benefitted" from the underpayment; (6) the requesting spouse has made a "good faith effort" to comply with income tax laws since; and (7) the requesting spouse was in poor physical or mental health. Rev. Proc. 2013-34 § 4.03(2), 2013-43 I.R.B. 397, 400–03.

Although the tax court need not apply those factors, it typically does. *See Pullins v. Comm'r*, 136 T.C. 432, 449–55 (2011); *Nationalist Movement v. Comm'r*, 102 T.C. 558, 583 (1994). This case was no different. After hearing testimony and considering other evidence, the tax court found that three factors favored relief—marital status, lack of significant benefit, and later compliance with tax laws. And it found that another three—economic hardship, legal obligation, and health—were neutral. But the tax court also concluded that the remaining factor, knowledge or reason to know, weighed "strongly against relief." It then balanced the factors and denied Lori's claim for equitable relief.

Lori urges us to reverse that judgment and hold that the tax court abused its discretion in denying her claim. As she sees it, the tax court erred in three ways. First, she asserts that the tax court should have treated the economic hardship

6

factor as a positive factor weighing in favor of relief rather than a neutral one. Second, she disputes the tax court's determination that the knowledge or reason-to-know factor weighed against relief. And finally, she argues that the tax court placed "too much weight" on that one factor when balancing the factors together. We consider these arguments in turn.

A.

We begin with the economic hardship factor. An economic hardship exists if "satisfaction of the tax liability in whole or in part will cause the requesting spouse to be unable to pay reasonable basic living expenses." Rev. Proc. 2013-34 § 4.03(2)(b), 2013-43 I.R.B. 397, 401. The burden of making that showing falls on the spouse requesting relief. *See Neal*, 557 F.3d at 1277. If her income is below 250% of the poverty line, this factor favors relief—unless she has assets from which she can make payments towards the tax liability while still adequately meeting her basic living expenses. Rev. Proc. 2013-34 § 4.03(2)(b), 2013-43 I.R.B. 397, 401.

Applying that guidance here, the tax court found that the economic hardship factor was neutral. Although Lori's income fell below the poverty line—she worked a part-time job making $10 per hour—the tax court noted that "she has equity in her townhouse and could make at least some partial payment on the liabilities."

That was not an abuse of discretion. As we explained in *Neal*, an "incomplete picture" of the requesting spouse's basic living expenses "cuts against relief." 557 F.3d at 1278. And the picture here isn't just incomplete—it's

7

nonexistent.  Lori failed to provide *any* evidence at trial as to the amount and nature of her living expenses.  That failure is especially critical here, where the record evidence indicates that David was covering at least some of her living expenses; their divorce agreement provided that David would "be responsible for and pay the remaining mortgage indebtedness" on Lori's townhouse.

The record likewise sheds little light on Lori's current assets.  She did, of course, testify that she had more than $100,000 of equity in her townhouse.  And although Lori faults the tax court for relying on that fact—arguing that she shouldn't be forced to borrow against her home—she potentially had several other sources of money available to her as well.  For one thing, Lori received $26,000 in insurance proceeds when her boat was destroyed in a fire around 2015.  Her divorce agreement also indicates that she received $51,000 from David's retirement accounts, and another $10,000 in spousal-support payments.  If substantial portions of those funds were unspent, Lori could have used them to make payments toward the Sleeths' unpaid tax liabilities and still "adequately meet" her basic living expenses.  Rev. Proc. 2013-34 § 4.03(2)(b), 2013-43 I.R.B. 397, 401.  Yet she never offered any evidence that she no longer had access to those funds.  Nor did she offer any evidence suggesting that part-time work at $10 an hour was the most she could earn.

Lori, in short, offered the tax court a very slim record.  Though the little evidence she put before the tax court did not paint a bright financial picture, it also left a lot of uncertainty.  Establishing hardship was her burden, and she failed to

meet it. *See Neal*, 557 F.3d at 1277. We therefore cannot say that the tax court abused its discretion in concluding that the economic hardship factor was neutral.

B.

We next consider the knowledge or reason-to-know factor. This factor weighs against relief if it was unreasonable for the "innocent spouse" to believe that the other spouse "would or could pay the tax liability shown on the return" within a reasonable time of filing. Rev. Proc. 2013-34 § 4.03(2)(c)(ii), 2013-43 I.R.B. 397, 401–02. And when evaluating whether the "innocent spouse" had reason to know that their tax liabilities would not be paid, the Revenue Procedure tells courts to look to, among other things, her level of education, her involvement in "business or household financial matters," her level of "business or financial expertise," and any "deceit or evasiveness" by the non-requesting spouse. Rev. Proc. 2013-34 § 4.03(2)(c)(iii), 2013-43 I.R.B. 397, 402.

Here, Lori signed the three returns at issue, so we presume that she had constructive knowledge of the information reported on them. *See Porter v. Comm'r*, 132 T.C. 203, 211 (2009); *see also, e.g.*, *Hayman v. Comm'r*, 992 F.2d 1256, 1262 (2d Cir. 1993). Those returns showed that the Sleeths' estimated tax liability had not been paid for all three years, and that they had racked up over $363,000 in unpaid taxes, excluding interest and penalties. The returns also showed that the Sleeths' unpaid tax liabilities rivaled David's $418,000 adjusted gross income at the time. Moreover, two of those returns were filed a year or more after they were due.

9

Instead of asking any questions, Lori says she simply "assumed [the taxes] would be paid." She argues that her assumption was reasonable, contending that we should not expect a "homemaker with some college education" to "understand the financial consequences" of the Sleeths' tax situation. But it takes no special knowledge to understand that the Sleeths' substantial tax liabilities—accumulated over three years—would be difficult to pay in a timely manner. *See Stevens v. Comm'r*, 872 F.2d 1499, 1506–07 (11th Cir. 1989); *see also Sanders v. United States*, 509 F.2d 162, 169 (5th Cir. 1975) (considering the "complexity" of the financial issue).[3] That is especially true when those liabilities nearly outmatched the Sleeths' annual income—even before factoring in interest and penalties.

Lori next argues that she had no reason to know that David couldn't pay their tax liabilities because she had lived apart from him for several years. But the record suggests that she was well aware of David's financial troubles. For one thing, Lori and David had been trying to offload their home—the big house—for "four or five years" without success. It was eventually repossessed in 2012—just one year after the Sleeths' 2008, 2009, and 2010 returns were filed. Lori and David also shared some of their finances over those years. According to David, they had at least one joint checking account and one joint savings account, and Lori had access to those accounts and could make withdrawals from them.

What's more, Lori knew that the Sleeths had "other issues" with the IRS before, and that kind of knowledge can also weigh against relief here. Rev. Proc.

---

[3] This Court adopted as binding precedent all Fifth Circuit decisions issued prior to October 1, 1981. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

2013-34 § 4.03(2)(c)(ii), 2013-43 I.R.B. 397, 401–02.  She even testified that she knew David did not pay their 2005 income tax on time, and that she traveled to the IRS's Huntsville office to help sort it out.  This should have both alerted her to the possibility of other tax issues and led her to ask whether David would have trouble paying their taxes in the future.  *See, e.g.*, *Kistner*, 18 F.3d at 1525.  Though Lori counters by pointing to David's testimony that he would have hidden his financial troubles from her if she asked, the tax court was not required to credit that bald assertion, especially considering that the divorce settlement legally obligated him to intervene in support of Lori's claim.  *See Henson v. Comm'r*, 887 F.2d 1520, 1526 (11th Cir. 1989).  Moreover, the fact that the tax court found no evidence that David had been dishonest with Lori about their finances pointed in the opposite direction.  *See United States v. $242,484.00*, 389 F.3d 1149, 1154 (11th Cir. 2004) (inferring factual findings consistent with a court's judgment).

In short, Lori signed the Sleeths' returns, was aware of their shared financial troubles, and knew of their prior problems with the IRS.  Considering all these facts and circumstances, the tax court did not abuse its discretion in weighing the knowledge or reason-to-know factor against relief.

## C.

Finally, we address Lori's argument that the tax court placed "too much weight" on one factor—knowledge or reason to know—when balancing them together.  Here, too, we disagree.  To begin, "nothing in the statute or revenue procedures" prevents the tax court from "concluding that in light of 'all the facts and circumstances,'" the knowledge or reason-to-know factor "weighs heavily

11

against granting equitable relief." *Jacobsen v. Comm'r*, 950 F.3d 414, 422 (7th Cir. 2020) (quoting § 6015(f)). And that is exactly what happened here. The tax court first considered the facts and circumstances and evaluated all the relevant factors. It then concluded that Lori's "unwillingness to confront the financial problems she and [David] faced weighs strongly against relief." In the tax court's view, that tipped the scales in favor of denying equitable relief.

In response, Lori asserts that the tax court "improperly allowed a single factor against relief to outweigh three positive factors favoring relief." Not so. In fact, Revenue Procedure 2013-34 explicitly notes that it may still be appropriate to deny equitable relief even though more factors weigh in favor of it than against it. *See* Rev. Proc. 2013-34 § 3.05, 2013-43 I.R.B. 397, 398. Indeed, although "no one factor or a majority of factors *necessarily* determines the outcome," the tax court may deny equitable relief even if just one factor weighs against it. Rev. Proc. 2013-34 § 4.03(2), 2013-43 I.R.B. 397, 400 (emphasis added); *Jacobsen*, 950 F.3d at 421–22. Given that, we do not see how the tax court abused its discretion.

\*       \*       \*

Tax courts are entitled to considerable discretion when granting or denying equitable relief under § 6015(f). We can only reverse when the tax court abuses that discretion. Because it did not do so here, we **AFFIRM**.[4]

---

[4] We thank Harvard Law School's Federal Tax Clinic for an excellent job representing Lori Sleeth in this appeal. We also commend third-year law student Madeleine DeMeules for her performance at oral argument.

12