**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————

No. 24-12884

————————————

LILY BARRETT,

*Plaintiff-Appellant,*

*versus*

DIANA WILLIAMS,

LISA ECKEL,

JENNIFER BUCHANAN,

In their official and individual capacities,

*Defendants-Appellees,*

————————————

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 4:23-cv-00247-MW-MAF

————————————

Before ROSENBAUM, GRANT, and ABUDU, Circuit Judges.

GRANT, Circuit Judge:

Lily Barrett was working toward her doctorate in neuroscience at Florida State University when she hit a roadblock. Her main faculty sponsor, known as a "major professor," was no longer willing to work with her, citing doubts about the quality of Barrett's research, as well as reports of both protocol violations and interpersonal issues. University policy required that Barrett find another major professor to continue in the neuroscience program. So for five months, she reached out to other professors in the department—but no one would agree to work with her. Lacking a major professor, she chose to graduate with just a master's degree.

But graduation did not mark the end of Barrett's dispute. Still smarting from her failure to find a new major professor and earn the Ph.D. she originally sought, Barrett sued about a month after graduating. She alleged violations of her procedural due process rights. The district court granted summary judgment to the defendants. We affirm because Barrett received adequate process.

## I.

In August of 2019, Barrett began working toward a Ph.D. in neuroscience at Florida State University. Her major professor was Dr. Xiaobing Zhang, the faculty mentor who had sent her offer letter when she was first admitted to the program.

And what is a major professor? The major professor, in conjunction with the student's doctoral supervisory committee, determines whether the student's work satisfies the University's

requirements. As Barrett put it, you're "in their lab, you're doing their research," and they're teaching you "how to be a good scientist." Students must have a major professor to continue in the program, but they are not entitled to one—the student, the professor, and the program director must all consent to the arrangement.

Normally, a student works with the same professor who invited them to the program; an applicant that no one wants to work with would typically get rejected. Still, if problems emerge after admission, either the student or the professor can end the relationship at any time.

Barrett initially "really hit it off" with Zhang, her first major professor, but things eventually went off track for the pair. Barrett alleges that he called her "stupid" in front of other people, belittled her intelligence, and had her work "extremely long" hours—as late as 9 p.m., she said. She reported the behavior, and decided that Zhang's lab was "not a healthy environment." So halfway through her second year, she switched to Dr. Diana Williams, another professor in the Department.

New problems emerged almost immediately. Williams's lab manager, Lisa Anderson, told Williams that Barrett was not receptive to training in Williams's lab protocols and technology. Williams says she followed up with several conversations with Barrett to emphasize the importance of training and following lab protocols. Williams also says that students reported that Barrett was condescending and rude as early as the spring. Despite this

behavior, Barrett ended the year with solid marks in her classes. Still, that summer Williams received reports that Barrett was rude and hostile to an undergraduate in the lab.

Reports of Barrett's bad behavior continued: hostility toward her peers, inability to receive correction about improper lab technique, and mistreatment of laboratory animals. Williams also said that members of her lab and another lab reported that Barrett was calling other students and the lab manager "stupid and incompetent." For months, she met with Barrett to address these issues. Eventually, Williams told Barrett that she would "not continue to be her advisor if this happened again."

Williams described another incident where two students told her that Barrett handled the mice in a "rough, callous" way. They also claimed that she had put a mouse in a carbon dioxide chamber, but had grown impatient waiting for it to die. According to those students, she shook the mouse, asking "why won't you just die" before covering its nose and mouth with her fingers until it stopped breathing. Barrett denied the allegations, but Williams remained concerned. Around the same time, either Barrett or one of the undergraduates she was working with accidentally left the food gate closed, causing her mice to go without food for 23 hours. Barrett was supposed to weigh the animals and report the incident, but did not do so because she failed to realize anything was amiss. The Animal Care and Use Committee investigated, but declined to issue discipline.

24-12884                Opinion of the Court                5

Still, these incidents led Williams to tell Barrett that her original path to getting a Ph.D. had changed. Barrett had more research to do, but to continue under Williams, she would need to shift her research away from living things and work in the lab only while Williams was present. Williams, after all, was responsible for what took place in her lab. Student mistreatment of animals could, by Barrett's own admission, affect Williams's funding, research quality, and ability to publish. Williams warned that one more report of misbehavior would result in Barrett no longer being allowed in the lab. For her part, Barrett says that some of the incidents described above never took place and that others were severely misconstrued.[1]

The reports continued. Two students raised concerns about the quality of Barrett's research, and one described bullying behavior from Barrett that made her afraid. On top of that, Williams had observed Barrett in the lab and did not like her research technique. True to her word, Williams emailed Barrett to tell her that she would no longer be serving as her major

---

[1] A few notes about the record. First, because we are at the summary judgment stage we take the record in the light most favorable to Barrett. *See Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458 (11th Cir. 1994). But that does not mean we omit allegations against her. Whether they occurred or not, the allegations affected Williams's opinion of Barrett. It is in that light that we consider them here. What's more, we are not bound to accept, and do not accept Barrett's repeated mischaracterizations of the record. *See id.* In her opening brief, for example, Barrett claims that Williams testified that Barrett's alleged remarks "weren't unprofessional." But Williams said the opposite: "I think that was unprofessional."

professor—meaning Barrett would have to leave the lab. Williams cited the new reports, along with her own observations that Barrett's laboratory technique was too sloppy to yield scientifically valid results.

Barrett was in a tough academic spot. Earning her doctorate would require a certain amount of research data. She had already collected some in Williams's lab, but would probably need another year or two to finish. And she could not use that data without Williams's permission, which she did not have. If she had to start over, it would likely have taken four or five more years to finish, and she was "hoping" to avoid that. After all, it typically takes about five years to get a Ph.D. in the program and Barrett had already spent more than three—one and a half with Zhang and almost two with Williams—with no end in sight.

In the immediate term, Barrett needed to register for classes to remain a full-time student, but she had to list a major professor to do so. Her first move was to hire a lawyer and fire off a 31-page request for reconsideration to Williams that denied the allegations of scientific incompetence and bullying. Williams considered the report, but stuck with her initial decision. In the meantime, Barrett secured a stand-in—Dr. Lisa Eckel, the director of the neuroscience program. Eckel let her register for spring classes using her name, but told her that she would need a new major professor to continue after that. This gave Barrett until March—five months—to find one. She "reached out to all faculty with open positions to no

avail." So in April, she decided to cut her losses and graduate with a master's degree.

About a month later, Barrett sued Williams, Eckel, and several other officials under 42 U.S.C. § 1983, alleging violations of procedural due process. The district court granted summary judgment to the defendants, reasoning that Barrett's due process challenge did "not exist" because she had not "attempted to avail herself of any remedy available under Florida law."[2] We affirm, although on a different basis.

## II.

This Court reviews "de novo a district court's grant of summary judgment, viewing all evidence and drawing all reasonable factual inferences in favor of the nonmoving party." *McCreight v. AuburnBank*, 117 F.4th 1322, 1329 (11th Cir. 2024) (quotation omitted). When "a movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," summary judgment "is appropriate." *Id*. (quotation omitted). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could

---

[2] The district court relied on *Valencia*, a case in which the plaintiff could have sought relief through state certiorari because he had a university disciplinary decision. *Doe v. Valencia Coll.*, 903 F.3d 1220, 1235 (11th Cir. 2018). Barrett asserts that *Valencia* was wrongly decided, but we need not consider that contention because we conclude that she received adequate process at the University level.

return a verdict for the non-moving party." *Id.* (quotation omitted).

## III.

The Due Process Clause "forbids the State to deprive any person of life, liberty, or property without due process of law." *Goss v. Lopez*, 419 U.S. 565, 572 (1975). Where "a person has already acquired [a property interest] in specific benefits," the state must jump through certain minimum hoops to revoke those benefits. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 576 (1972). The educational system provides two contexts for student-related process: disciplinary and academic. *See Bd. of Curators of the Univ. of Missouri v. Horowitz*, 435 U.S. 78, 87 (1978).

The disciplinary context concerns school efforts to restore order and address misconduct, typically through suspension or expulsion. *See id.* In most disciplinary situations, due process requires that students receive notice of the charges against them and an opportunity to tell their version of events. *Id.* at 86. The hearing provides "a meaningful hedge against erroneous action." *Id.* at 89 (quotation omitted). But the academic context concerns "a very different matter"—the "failure of a student to meet academic standards." *Id.* at 86–87 (quotation omitted). This inquiry is "more subjective and evaluative" and "calls for far less stringent procedural requirements." *Id.* at 86, 90.

Due process for academic matters is satisfied by a "careful and deliberate" decisionmaking process. *Haberle v. Univ. of Alabama in Birmingham*, 803 F.2d 1536, 1539 (11th Cir. 1986) (quotation

24-12884                Opinion of the Court                        9

omitted).    That process though, can include consideration of conduct outside the classroom.  In *Horowitz*, for example, the Supreme Court had no trouble affirming a medical school's refusal to graduate a student who had poor performance, erratic attendance, and unsatisfactory clinical skills, and "lacked a critical concern for personal hygiene."  435 U.S. at 81.  A series of reviews confirmed the "low-satisfactory" performance of the student.  *Id.* at 82 (quotation omitted).    The student appealed after being dismissed, and the provost, after examining the record, denied the student's appeal.  *Id.*

The reason fewer formal procedures are required is that academic dismissals often call for "an expert evaluation of cumulative information," a task for which administrative or judicial tools are ill-suited.  *Id.* at 90.  In fact, "a hearing may be useless or harmful in finding out the truth concerning scholarship." *Mahavongsanan v. Hall*, 529 F.2d 448, 450 (5th Cir. 1976).[3]  So as a general matter, courts grant "wide latitude and discretion" to universities in setting academic degree requirements.  *Id.*  And courts are wary of injuring "the critical faculty-student relationship" by requiring layers of process before those decisions can be made.  *Horowitz*, 435 U.S. at 91 n.6.

---

[3] "This Court adopted as binding precedent all Fifth Circuit decisions issued prior to October 1, 1981."  *Sleeth v. Comm'r*, 991 F.3d 1201, 1207 n.3 (11th Cir. 2021) (citing *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc)).

Barrett's claim is fundamentally academic. And in considering that claim, we note that Barrett is not entirely clear on what her property interest was or when she was deprived of it. Still, we assume that she had a protected property interest and was deprived of that interest. So the real question is whether she received enough process.

From the start, Barrett knew that she needed to have a major professor to complete the program—and that such a relationship had to remain mutually agreeable. The handbook itself was clear that "all students must have a major professor" to "remain in the program." Indeed, Barrett demonstrated full understanding of this requirement by switching professors from Zhang to Williams when her first professional connection deteriorated. And major professors do more than look at a student's charts and research. Barrett describes their role as teaching each student "how to be a good scientist, following protocol, following policy," all in service of today's student becoming tomorrow's "independent scientist."

Barrett argues that she did not receive notice and careful deliberation. Not so. The record demonstrates that issues between Professor Williams and Barrett took months to develop. Williams provided repeated warnings and opportunities to improve before finally giving Barrett three options: (1) find a new lab; (2) leave the program with a master's degree; or (3) finish out her current experiment under Williams's direct supervision and find a new research project that did not involve animals to serve as the final piece of her dissertation. This third option, to be fair, would have

required the approval of Barrett's supervisory committee, which was not guaranteed.  But the point is that Williams gave Barrett notice of her dissatisfaction and the dangers it posed to her graduation, as well as a variety of options on how to proceed.  *See id.* at 85.  Only after a long series of warnings and new behavior problems did Williams conclude that Barrett had failed to satisfy her standard of what a future scientist should be, so she could work with her no longer.

Barrett also had multiple opportunities to plead her case, only some of which she took.  When Williams invited Barrett to an "important" meeting, Barrett responded with suspicion and refused to attend.  Williams emailed her several days later that she would no longer work with her.  Though Barrett chose not to meet with Williams, the discussion was offered.  Skipping the opportunity to plead your case is not the same as being denied that chance in the first place.  Meeting with Williams would have provided an opportunity for Barrett to defend her position.  And in any event, after leaving the lab, Barrett emailed Williams a 31-page, professionally prepared request for reconsideration that Williams testified received "ample consideration."  The fact that she did not change her mind does not show that she ignored the document, and Barrett has provided no evidence that it was not really considered.

Other officials also provided opportunities for Barrett to pursue remedies.  Eckel, the program director, offered to help schedule a meeting between Barrett and her supervisory

committee, the group responsible for deciding if Barrett's work satisfied the doctoral requirements. Barrett never responded. Again, this meeting would have presented an opportunity for Barrett to defend herself and her research, this time without Williams present. What's more, the graduate student ombudsman, Dr. Adrienne Stephenson, told Barrett she could reach out to the department chair or to the associate deans to seek relief. Stephenson explained that most issues get resolved by "working through this chain of command." But again, Barrett did not even try.

For five months, Barrett did reach out to all faculty with open positions both in person and over email. In fact, at least one considered working with her, but in the end declined to do so. And there is no evidence that Williams or Eckel stymied these efforts. To the contrary, though Barrett claims that they must have tanked her chances with other professors by badmouthing her, what evidence we have shows that Williams and Eckel were discreet, telling the rest of Barrett's doctoral committee little more than that Williams and Barrett had parted ways. And though Eckel and Williams gave a general explanation of why Barrett left the lab to a prospective major professor who inquired, they did not volunteer the information. In this posture, we make all reasonable inferences in Barrett's favor, but "an inference based on speculation and conjecture is not reasonable." *Ave. CLO Fund, Ltd. v. Bank of Am., N.A.*, 723 F.3d 1287, 1294 (11th Cir. 2013) (quotation omitted).

Throughout the process, Barrett understood the academic requirements, and the school provided substantial opportunities to help her meet them.  We see no evidence that the decisionmaking process was not careful and deliberate.  *See Horowitz*, 435 U.S. at 85. The fact that Barrett did not choose to take advantage of all the opportunities for process, or that she did not get the answer that she wanted when she did, does not mean that it was inadequate. *Arango v. U.S. Dep't of the Treasury*, 115 F.3d 922, 926 n.8 (11th Cir. 1997).

In response, Barrett argues that she was entitled to a hearing because her deprivation was disciplinary, not academic.  *See Horowitz*, 435 U.S. at 88–89.  While she admits she was never formally disciplined, she claims that Williams parted ways with her based on factual conclusions that could have been objectively assessed, which means a hearing was necessary to avoid an erroneous decision.

That is not the test.  A hearing is required when a student faces discipline for violating "valid rules of conduct."  *Id.* at 86.  And discipline generally means suspension or expulsion, neither of which happened to Barrett.  *See e.g.*, *Goss*, 419 U.S. at 584.  Even then, some disciplinary situations require no more than "an informal give-and-take between the student and the administrative body dismissing him that would, at least, give the student the opportunity to characterize his conduct and put it in what he deems the proper context."  *Horowitz*, 435 U.S. at 86 (quotations omitted).  Here, Williams grounded her decision to discontinue her

major-professor relationship with Barrett in her view that Barrett was failing to perform at an adequate level for a doctoral student. Williams's separation was no more a punishment than a failing grade is punishment for a bad exam. Both are the natural result of unsatisfactory academic performance.

Barrett concedes that Williams had a right to withdraw as her major professor; she even pleaded her case to Williams via email and received "ample consideration." As we have said, it "may be unfortunate to spend years studying a discipline only to discover that one's capabilities do not pass academic muster." *Haberle*, 803 F.2d at 1541. But whether a student has the qualifications to earn a doctoral degree is an academic question. *See id.* And "in so evaluating the student, the school considers and weighs a variety of factors," some of which are not "adaptable to the factfinding hearing." *Horowitz*, 435 U.S. at 91 n.6. Indeed, requiring a hearing may injure the "critical faculty-student relationship." *Id.*

Barrett received adequate process. She was free to present her side of the academic dispute to potential major professors, but her own actions suggest she thought that would be imprudent. Barrett did not meet with the department chair, the associate deans, or even her supervisory committee to raise the issue and argue her position. In her own words, she made "a very large effort internally to not talk about [Williams's email] with anybody at all because that is so damaging" to her personal reputation that she "didn't want to spread it." That was her choice to make. And it

24-12884                Opinion of the Court                15

may have been a good one since she graduated with a master's degree even after working her way through two major professors and spending months enrolled without one.

★      ★      ★

We **AFFIRM** the judgment of the district court.